702 A.2d 1008

IN THE MATTER OF THE TRUST FOR THE BENEFIT OF DORIS DUKE, ET AL., UNDER INDENTURE AND DEED OF TRUST AND PERSONALTY DATED DECEMBER 11, 1924, OF JAMES B. DUKE.

Superior Court of New Jersey
Chancery Division Probate Part
Somerset County

Decided July 13, 1995.

414

*James C. Pitney* for plaintiff trustees of The Doris Duke Trust (*Pitney, Hardin, Kipp & Szuch,* attorneys; *Mr. Pitney, Richard Kahn* and *Lynn C. Halpern,* on the briefs).

*Gordon A. Millspaugh, Jr.* for defendant The Duke Endowment (*Herold & Haines,* attorneys; *Wayne A. Cross, Charles A. Severs, III, John Spuches, Ann G. Rappleye, Heather K. McDevitt, Joanna R. Swomley,* of counsel for *Dewey Ballantine,* attorneys; *Mr. Millspaugh* and *Earl Bennett,* on the briefs).

*Ann G. Rappleye* and *Wayne A. Cross* for defendant The Duke Endowment (*Dewey Ballantine,* attorneys).

*David G. Keyko* for defendant Heffner (*Winthrop, Stimson, Putnam & Roberts,* attorneys).

DUPUIS, J.S.C.

This matter comes before the court upon cross-motions for summary judgment by the Duke Endowment ("The Endowment") and Chandi Duke Heffner ("Ms. Heffner"). Ms. Heffner has also filed motions to remove the Trustees, to disqualify the law firm of Dewey Ballantine and to strike certain allegations of the complaint.

On December 11, 1924, James B. Duke, a legal resident of the state of New Jersey, executed his last will and testament and two trust instruments. All three of the documents were drafted by William R. Perkins, Esq. The first trust instrument, which Mr. Duke denominated "The Duke Endowment", was created in order to perpetually benefit certain named charities. The second, denominated the "Doris Duke Trust", was created for the benefit of Mr. Duke's daughter, Doris Duke ("Miss Duke"), and certain other named relatives.

The Doris Duke Trust ("The Trust") provided that two-thirds of the income in The Trust would be paid to Miss Duke each year until her death. The remaining one-third would be paid to certain other named relatives. Upon Doris Duke's death, her two-thirds portion of the yearly trust income would be paid per capita in equal installments to her lineal descendants for life, not to exceed twenty-one years after the death of certain named relatives. At the expiration of the twenty-one year period, two-thirds of the corpus of The Trust would be paid per capita in equal installments to her lineal descendants. In the event Doris Duke died without lineal descendants, The Trust would terminate and Miss Duke's two-thirds portion of The Trust would be paid to the Duke Endowment.

Miss Duke had one natural child who died in infancy. On November 10, 1988, she legally adopted Charlene Gail Heffner, now known as Chandi Duke Heffner ("Ms. Heffner"), pursuant to New Jersey's adult adoption statute, *N.J.S.A.* 2A:22–1 to –3. Ms. Heffner was thirty-five years old at the time of the adoption, and Miss Duke was seventy-five years old. When Miss Duke died on

October 28, 1993, Ms. Heffner demanded that the Trustees of the Doris Duke Trust immediately commence payments to her as the successive life beneficiary of the Doris Duke Trust.

The Trustees have requested that the court instruct it on the disposition of Miss Duke's two-thirds share of The Trust. It is the Endowment's position that, since Miss Duke was not survived by any natural children, she has no lineal descendants, and the assets therefore pass to the Duke Endowment. The Endowment seeks an order declaring it to be the remainderman of two-thirds of the assets of The Trust and instructing the Trustees to distribute the assets to the Endowment.

Ms. Heffner, on the other hand, seeks an order declaring that she, as Miss Duke's sole lineal descendant, is entitled to that income. The Doris Duke Trust has a current estimated worth of $170,000,000.

These motions turn on the critical question of whether Ms. Heffner can in fact be classified as a "lineal descendant" as that term is used in the Doris Duke Trust. If so, she is entitled to two-thirds of the income from The Trust's assets and, at the end of twenty-one years after the death of certain named relatives, will be entitled to two-thirds of the corpus of The Trust as well.

In order to determine whether Ms. Heffner is Miss Duke's lineal descendant, the court must first determine the governing law. The Endowment argues that, pursuant to Article Eighth of the trust document, the court must use the law in force at the time James B. Duke executed the trust instrument in 1924. It is The Endowment's position that, since New Jersey did not permit adult adoptions in 1924, Ms. Heffner would not be considered a lineal descendant.[1] The Doris Duke Trust provides in Article Eighth:

*This Indenture is executed by a resident of the State of New Jersey in said State, is intended to be made, administered and given effect under and in accordance*

---

[1] New Jersey's first adult adoption statute, *N.J.S.A.* 2A:22–1 to –3, was passed on March 25, 1925, approximately 100 days after the execution of the Trust. 1925 *N.J.Laws* 99.

*with the present existing laws and statutes of said State,* notwithstanding it may be administered and the beneficiaries thereof may be located in whole or in part in other states, and the validity and construction thereof shall be determined and governed in all respects by such laws and statutes (emphasis added).

Alternatively, The Endowment argues that even if this court were to apply the law in existence at the time of Miss Duke's death in 1993, the "stranger to the adoption" doctrine would bar Ms. Heffner from taking under The Trust. That doctrine prohibits adult adoptees from taking from lineal or collateral relatives other than the adoptive parents.

Ms. Heffner argues that present law governs. She contends, first, that the law to be applied is the law at the date the class is determined, that is 1993, the date of Miss Duke's death. Second, she argues that even if 1924 law governs, the absence of a statute in New Jersey authorizing adult adoptions in 1924 does not disqualify her as a lineal descendant since New Jersey courts at the time recognized adult adoptions from other states. Third, she argues the statutory law of New York, which permitted adult adoptions in 1924, is relevant since The Trust was drawn by a New York attorney. Fourth, she argues that New Jersey and other states have applied adoption statutes revised after the execution of the will and trust. Fifth, she contends the Trustees are precluded from arguing a position inconsistent with a prior consent judgment they received in an earlier action brought to construe certain portions of The Trust. Finally, she contends the "stranger to the adoption" doctrine is not applicable.

It is clear that while a motion for summary disposition should be granted with caution, where no genuine issue of fact is raised by the pleadings or affidavits and there is an absence of showing by defendants that they have a ground of defense, plaintiffs are entitled to a summary disposition. *Judson v. Peoples Bank & Trust Co. of Westfield,* 17 *N.J.* 67, 73–75, 110 *A.*2d 24 (1954); *R.* 4:46–2.

This matter had previously been before this court on The Endowment's motion for summary disposition. This court permitted a period of discovery to determine what evidence could be

produced that would bear on the issue of Mr. Duke's intent. Extensive discovery has taken place and both parties agree the question is one of law to be decided on summary judgment.

In determining the meaning and effect of a deed of trust, the primary inquiry must be to ascertain the intent of the settlor from the language of the instrument itself. *In re Trust Co. of Morris County*, 83 *N.J.Super.* 411, 416, 200 *A.*2d 330 (App.Div. 1964). In so doing, the judicial function is to ascertain and give effect to the probable intention of the settlor. *Ibid.* The general principles which govern interpretation of trust instruments are the same as those which govern interpretation of instruments under which property is disposed absolutely whether by instrument *inter vivos* or by will. *In re Voorhees' Trust*, 93 *N.J.Super.* 293, 299 n. 1, 225 *A.*2d 710 (App.Div.1967).

If the settlor's intent cannot be ascertained or is susceptible to a number of meanings, this court must conduct a hearing to determine Mr. Duke's probable intent. Ms. Heffner contends the settlor's intent cannot be ascertained on the face of the instrument.

Initially, Ms. Heffner contends the language of the trust instrument requires this court to use the law in 1993, not 1924. It is her position that Mr. Duke would have included adopted adults as lineal descendants. She contends she has successfully proven that James B. Duke was a "man of the times", deeply concerned with family and particularly concerned for those without families. She asserts that Mr. Duke would never have excluded adopted persons, either child or adult, from his generosities, that he encouraged adoption and even offered to adopt his step-son. She argues that Mr. Duke demonstrated he knew how to limit his beneficiaries to those "of the blood" by specifically doing so in several documents, and she claims that since he did not do so in the case of the Doris Duke Trust, this court must find that he intended to include adopted children as well as natural children in the term "lineal descendants."

Ms. Heffner offers such evidence as an affidavit by Dr. E. Wayne Carp, an expert on the history of adoption, stating that Mr. Duke would have approved of adoption, particularly adult adoption; his special benevolence toward orphans, possibly as a result of he himself growing up without his mother; the fact that he resided in New York, where adoptions were legal as of 1915; the fact that adult adoption was practiced by Mr. Duke's social peers; Mr. Duke's commitment to African–American causes, which "shows he was ahead of many of his fellow Southerners in social thinking"; statements of people who knew Mr. Duke that he was "forward-thinking" and had a willingness to adapt; his tremendous love for his daughter Doris; the importance of family to Mr. Duke; and his decision to exclude an adopted relative from his will by providing only for "blood relatives."

Ms. Heffner argues that James B. Duke was a sophisticated businessman who must have anticipated later changes in the law that might affect membership in the class. She cites a Kansas decision, *In re Estate of Fortney*, 5 *Kan.App.*2d 14, 611 *P.*2d 599 (1980) to support this position.[2]

■ As stated in *Fortney*, the tools in aid of the search for the testator's intent are the language contained within the four corners of the document, plus extraneous circumstances surrounding its execution which assist in understanding his true intent and purpose. *Id.* 611 *P.*2d at 602, *quoting In re Estate of Lehner*, 219 *Kan.* 100, 547 *P.*2d 365, 368–369 (1976). The court in *Fortney* permitted an adult adoptee to take despite the fact that the will was drawn seventeen years before the adult adoption statute. However, in *Fortney*, the will did not address the issue of the law to be applied.

Ms. Heffner has been given an opportunity to discover circumstances surrounding the execution of the will which would indicate

---

[2] *Fortney* upheld the trial court's discretion to exclude, on grounds of materiality, published general history of the county in an attempt to show that the testator was an educated man. 5 *Kan.App.*2d 14, 611 *P.*2d 599, 601 (1980).

Mr. Duke's intent. No direct evidence has been found, which is not surprising given that seventy years have elapsed.

■ While all of the evidence which Ms. Heffner offers is historically interesting, it can be used only to surmise what Mr. Duke's intent might have been. None of it provides any concrete proof whatsoever of his actual intent. Indeed, much of it is irrelevant, and serious questions exist as to whether this evidence could be admitted at trial, although this court has considered all evidence for purposes of this motion. Accordingly, this court finds that Ms. Heffner has failed to demonstrate that any ambiguity exists in the language of the Doris Duke Trust, and that language must govern. This court determines that the plain and only meaning of the words "present existing laws and statutes" is that 1924 law must be used.

Second, Ms. Heffner argues that, even prior to the enactment of New Jersey's adult adoption statute, New Jersey recognized adult adoptions by other states and therefore hers would have been recognized as legal. This argument is irrelevant since Ms. Heffner was not adopted in another state. Furthermore, Mr. Duke chose to have his trust interpreted pursuant to the laws of New Jersey, not of any other state. His precise mandate was that The Trust was "intended to be made, administered and given effect under in accordance with the present existing laws and statutes of said State." There can be no other reading of this language, and it is undisputed that the language refers to the law of New Jersey.

Third, Ms. Heffner argues that since Mr. Duke's will was prepared by a New York attorney, New York law should apply. She relies upon *In re Thompson*, 53 *N.J.* 276, 250 *A.*2d 393 (1969) to support her argument. A careful reading of *Thompson* discloses that the court there addressed the issue of the New York scrivener only because the will did not state the law to be applied. As stated above, in this case Mr. Duke clearly stated the law of the State of New Jersey must apply.

Fourth, Ms. Heffner argues that New Jersey has applied adoption statutes of other states which were enacted or revised after execution of The Trust. She relies upon the decision in *In re Coe*, 42 *N.J.* 485, 201 *A.*2d 571 (1964). As will be discussed later, *Coe* is inapplicable given our courts' later decisions on this issue.

Fifth, Ms. Heffner argues that the Trustees are prevented from arguing that she is not a lineal descendant based upon a consent judgment entered in a Somerset County proceeding and a stipulation in a New York action. According to Ms. Heffner, the Trustees had initially refused to provide payments to certain adopted children of the named beneficiaries. However, after the Somerset County suit was filed and discovery commenced, the parties signed the consent agreement, the effect of which was to treat adopted children as lineal descendants. This 1976 consent judgment specifically provides that it is not to be construed as determinative of the settlor's intent. *See* Certification II of Benjamin Michel in Support of Defendant Heffner's Cross–Motion for Removal, Disqualification and to Strike Certain Allegations at Exhibit 13. Miss Duke and Ms. Heffner also entered into a stipulation on June 21, 1990 in a surrogate court action in New York which provided that Ms. Heffner would not receive income from the trust during Miss Duke's lifetime but that Ms. Heffner reserved her right to make such an application after Miss Duke's death.

The court has reviewed the arguments made to the courts in those two actions and finds that at no time did the Trustees argue that adult adoptees could take. Accordingly the principle of judicial estoppel does not bar their argument here. *Levin v. Robinson, Wayne & LaSala,* 246 *N.J.Super.* 167, 586 *A.*2d 1348 (Law Div.1990). Since both cases were settled on terms that specifically do not affect this case they are not controlling.

Having determined that the language of The Trust governs, this court must now determine the meaning of that language.

*1924 Law*

No right of adoption existed at common law as to either infants or adults. Such adoptions cannot take place in the absence of statute. The first New Jersey adult adoption statute was enacted on March 25, 1925, approximately 100 days after James Duke's trust was executed. 1925 *N.J.Laws* 99. It was only then that an adult could be adopted in this state. This court notes that Mr. Duke was still alive as of March 25, 1925 and in fact executed a codicil to his will on October 1, 1925. That codicil did not in any way refer to the newly enacted adult adoption statute.

■ As stated, the court is convinced that the intent of the settlor, Mr. Duke, can clearly be ascertained on the face of the instrument. Despite extensive discovery there remains no doubt in the court's mind that the phrase in the trust instrument "present existing law" means present law at the time of the execution of the trust instrument in 1924. The language in Article Eighth is clear.

> This Indenture ... *is intended to be made, administered and given effect under and in accordance with the present existing laws and statutes of said State* ... and the validity and construction thereof shall be determined and governed in all respects by such laws and statutes (emphasis added).

By this language Mr. Duke expressly mandated the application of 1924 New Jersey law to the construction of the Doris Duke Trust. A testator is presumed to use words in their "ordinary signification." *Pierson v. Jones*, 108 *N.J.Eq.* 453, 455, 155 *A.* 541 (Ch. 1931). Having examined all the evidence presented, and the will itself, the court cannot find any indication that the testator intended other than the ordinary meaning.

This court notes that under the terms of Article Sixth, distributions to be made to certain beneficiaries shall, if such beneficiaries are not living, be distributed "in all respects in accordance with the laws and statutes of the State of New Jersey *at the time of the death of such beneficiary....*" (emphasis added). Certainly, Mr. Duke was able to distinguish between distributees controlled by 1924 law and law at some future date.

■ It is undisputed that when Mr. Duke executed the Doris Duke Trust in December, 1924 there was no adult adoption statute in this state. New Jersey's adult adoption statute became effective on March 13, 1925. Consequently, Ms. Heffner could not take under 1924 law.

New Jersey courts have already determined that adult adoptees could not take as lineal descendants in 1924. *Commercial Trust Co. of NJ v. Adelung,* 136 *N.J.Eq.* 37, 40 *A.*2d 214 (Ch.1944), *aff'd,* 137 *N.J.Eq.* 541, 45 *A.*2d 841 (E. & A.1946). In that case, the settlor left a share of a trust to his "next of kin." He was survived by two adoptees, one a child and the other an adult. The language of the trust specifically provided that the trust should be distributed to the settlor's "next of kin" according to New Jersey law on distribution of personal property of those dying intestate existing at the time the trust was created. *Id.* at 39, 40 *A.*2d 214.

At the time of the settlor's death, there was no New Jersey law permitting adult adoption. The court permitted the adopted child, but not the adopted adult to take. The court found there was an assumption that the settlor would have intended his adopted child to take.

[I]n cases where a settlor, grantor, or testator, uses the words "child," "lawful heir," or "next of kin" with reference to himself, the assumption is that he intended to include in those classes adopted children of his own, whether adopted before or after the execution of the trust indenture, deed or will.

*Id.* at 45, 40 *A.*2d 214. However, the adopted adult, the court said, is not entitled to share in the trust, since he was an adult at the time of his adoption. *Id.* at 46, 40 *A.*2d 214.

The statute relating to the adoption of adults in New Jersey did not become effective in New Jersey until March 13th, 1925 (P.L.1925, ch. 99 p. 309), which is subsequent to the date of the trust indenture. Consequently, he cannot be considered as coming within the purview of the statute of distribution in force on the date of the indenture.

*Id.*

Ms. Heffner claims The Endowment has misread the *Adelung* decision and attempts to distinguish it in two ways. First, she emphasizes that the settlor in *Adelung,* by providing that the law

to be applied was the law of New Jersey *in force at this date*, froze the class definition of "next of kin" to its 1924 statutory definition. Mr. Duke's language, she argues, on the contrary referred only to the laws and statutes of New Jersey, requiring that the court apply the law as it exists at the time when vesting occurs.

This court fails to see the distinction between the language used by the settlor in *Adelung* and Mr. Duke's language. Mr. Duke provided that the Doris Duke Trust was to be given effect in accordance with the "presently existing" laws of the state of New Jersey. "Presently existing" necessarily means the laws in force as of December 11, 1924 when the trust was executed, and has the same effect as the settlor's language in *Adelung*. Ms. Heffner makes a distinction without a difference.

Ms. Heffner's argument that extrinsic evidence confirms that Mr. Duke did not intend to freeze interpretation of the trust under 1924 law is also unpersuasive. All of the evidence proffered by Ms. Heffner to demonstrate ambiguity on the face of the instrument is secondhand. None of the evidence presented, even if all of it is true, indicates Mr. Duke's actual intent; it only allows us to speculate about what his intent might have been. Even Doris Duke's own statements about what she believed her father would have done are unhelpful given that they constitute the opinion of someone who was just twelve years old at the time Mr. Duke died. Given the express mandate of the language in The trust, this evidence is irrelevant.

Ms. Heffner's second argument is that *Adelung* differs from this case because the settlor in *Adelung* modified the phrase "next of kin" with the words "of the Settlor", unlike Mr. Duke, who merely provided for payments to the "lineal descendants" of Doris Duke. By merely specifying lineal descendants, she argues, Mr. Duke intended to refer to the class of persons falling within that category as of Doris Duke's death. This interpretation, she asserts, is in accordance with the law existing in 1924. By creating a class gift, she argues, Mr. Duke necessarily ensured

that 1993 law would be applied to determine Miss Duke's lineal descendants. Therefore, she alleges acting in accordance with 1924 law actually mandates applying 1993 law.

*Identification of the Class*

There can be no doubt that Mr. Duke did in fact create a class gift. A class gift is defined as a gift to a group of persons, which group is uncertain in number at the time the gift is made and which is to be ascertained at a future time, who are all to take in equal or other definite proportions. *Rippel v. King,* 126 *N.J.Eq.* 297, 8 *A.*2d 777 (Ch.1939), *aff'd* 128 *N.J.Eq.* 179, 15 *A.*2d 758 (E. & A.1940). The share which each member of the class takes is dependent upon the actual number in the class. *Ibid.* When a class gift is made, the testator is presumed to intend that those shall take it who constitute the class at the time the gift is to take effect, providing no contrary intent is shown. *Damron v. Mast,* 121 *N.J.Eq.* 489, 191 *A.* 467 (Ch.1937). A class must be determined as of the date of death of the testator, unless the indenture or will plainly indicates otherwise. *Adelung, supra,* 136 *N.J.Eq.* 37, 40 *A.*2d 214. Here the instrument clearly requires the determination to be made as of Miss Duke's death, since her lineal descendants cannot be ascertained until her death.

This court is convinced that, under New Jersey law, the meaning of the term lineal descendants must be determined as of 1924, although the identification of the particular persons in the class must be made as of Miss Duke's death in 1993. *Trenton Trust Co. v. Gane,* 125 *N.J.Eq.* 389, 393, 6 *A.*2d 112 (Ch.Div.1939), aff'd, 126 *N.J.Eq.* 273, 8 *A.*2d 708 (E. & A.1939).

Ms. Heffner cites *Haskell v. Wilmington Trust Co.,* 304 *A.*2d 53, 54 (Del.1973), where the court, confronting a very similar issue, recognized that remainder beneficiaries are normally determined by the law in effect at the date of death of the life tenant. The *Haskell* court concluded that the adopted son of the life tenant fell within the class of "issue" in whom a remainder vested upon the life tenant's death. *Id.* at 55.

It is noteworthy that in *Haskell* there was no other evidence of the testator's intent. The court stated the rule that:

[T]he applicable law to the determining of a class following the termination of a life interest is the law as it exists on the date of ascertainment, *unless the documents themselves demonstrate a clear intent on the part of the creator to limit the class as it was defined by law on the date of execution of the trusts* (emphasis added).

*Id.* at 54. The court further stated:

[W]hen a testator makes a devise to a class, the membership in which is ascertainable at an indefinite future time, he is regarded as having contemplated the change in controlling laws prior to that time, and hence, is presumed, *in the absence of any contrary context in the will, to have intended that the statutes in effect at the time the gift becomes operative be resorted to in determining membership in the class* (emphasis added).

*Id.* at 54–55. *See also Van Tilburgh v. Hollinshead*, 14 *N.J.Eq.* 32 (Ch.1861) (where a will contains no specific indication to the contrary, the law at the time the estate vests controls); *In re Martell*, 457 *So.*2d 1064, 1067 (Fla.Dist.Ct.App.1984) (statute barring taking by an adopted child controls in the absence of a specific reference to the contrary in the trust). While specific identification of Miss Duke's lineal descendants obviously could not have been made until Miss Duke's death, the trust document requires that 1924 law be used.

*1993 Law and the "Stranger to the Adoption" Doctrine*

Assuming, *arguendo*, that 1993 law controlled, Ms. Heffner would still be barred from taking under The Trust, pursuant to the "stranger to the adoption" doctrine.

The current adult adoption statute reads in pertinent part:

The right of the person adopted, and of such persons as legally represent him on his death, to take and inherit intestate personal and real property from his natural parents and their kindred shall not be altered by the adoption. . . .

*N.J.S.A.* 2A:22–3. The "stranger to the adoption" provision appears in the next line:

*Except*, however, that:

a. The person adopted shall not be capable of taking property expressly limited by a will or any other instrument to the heirs of the body of the adopting parent or

parents, nor property coming on intestacy from the collateral kindred of the adopting parent or parents by right of representation; ... (emphasis added).[3]

Under this doctrine, an adopted adult cannot take if the trust is limited to "heirs of the body."

The language of The Trust provides that two-thirds shall be distributed to Doris Duke and then to and among the "lineal descendant or descendants of the said Doris Duke then living." Ms. Heffner argues that since Mr. Duke did not expressly use the term "heirs of the body", she can take under the 1924 Trust.

Ms. Heffner seeks to draw a distinction between the terms "heirs of the body" and "lineal descendants". This court questions the usefulness of this distinction as a guide to actual intent. The court is more persuaded by Chief Justice Weintraub's comments in *In re Estate of Coe*, 42 *N.J.* 485, 494, 201 *A.2d* 571 (1964), in which he stated:

> [W]e would not, as an original matter, distinguish among issue, descendants, children, and heirs, since ordinarily the word is not selected by the testator but rather by the scrivener, who, if he were conscious of the question whether adopted children should be in or out, would elicit the testator's wish and express it unequivocally.... [A] competent draftsman would not deliberately pick a word which instead of controlling the context is easily colored by it.[4]

Accordingly, this court gives no weight to the argument that Ms. Heffner is entitled to take under The Trust because Mr. Duke did not expressly use the term "heirs of the body".

The "stranger to the adoption" doctrine is a well-established, judicially-created doctrine. Historically, under the doctrine, New

---

[3] Compare New Jersey's first child adoption statute, enacted in 1877, which read as follows:

> The adopted child shall not be capable of taking property expressly limited to the *heirs of the body* of the adopting parent or parents, nor property coming from the collateral kindred of such adopting parent or parents by right of representation (emphasis added).

*In re Coe*, 42 *N.J.* 485, 487, 201 *A.2d* 571 (1964).

[4] Courts have held that the terms "descendant" and "issue" are interchangeable and coextensive. *In re Radt's Will*, 6 *Misc.*2d 716, 167 *N.Y.S.*2d 817, 818 (Surrog.Ct.1957).

Jersey courts have uniformly interpreted the statute as creating a presumption that an adopted child could not take property under an instrument created by someone other than the adoptive parent unless the instrument itself indicated a specific intent that the adopted child should take.

The doctrine first appeared in 1910 in the context of child adoptions, although it was not specifically called "stranger to the adoption." *Stout v. Cook,* 77 *N.J.Eq.* 153, 75 *A.* 583 (Ch.1910), *rev'd on other grounds,* 79 *N.J.Eq.* 573, 81 *A.* 821 (E. & A.1911). In *Stout* the adopted daughter of the testator's son sought to take under a provision in the testator's will providing for his son's "children". There was no adoption statute in force either at the time the will was executed or at the time of the testator's death. *Id.* at 164, 75 *A.* 583.

The court found that:

It is quite manifest that the testator did not have in mind the devolution of the title of any portion of his estate on an adopted child of either of his children for the reason that there was no law of this state under which such adoption could be had until 1877....

*Id.* at 165, 75 *A.* 583. "Such adopted child may inherit from the foster parent, but the adoption shall not operate to create a capacity to take as a child under the will of some other person." *Id.*

The doctrine was later determined to prohibit an adopted child from taking from a grantor or testator who was not the adoptive parent, even though there was a valid, legal adoption. *Ahlemeyer v. Miller,* 102 *N.J.L.* 54, 131 *A.* 54 (Sup.Ct.1925), *aff'd* 103 *N.J.L.* 617, 137 *A.* 543 (E. & A.1927).

In *In re Fisler,* 131 *N.J.Eq.* 310, 320, 25 *A.2d* 265 (Prerog.Ct.1942), *aff'd* 133 *N.J.Eq.* 421, 30 *A.2d* 894 (E. & A.1943), the Vice Ordinary held that an adopted child of the testatrix's grandniece was not entitled to take under a gift to the "lawful issue" of the grandniece. Affirming the judgment, the Court of Errors and Appeals stated:

[T]he word 'issue' signifies, *prima facie*, 'heirs of the body'; and the statute ordains that an adopted child shall not be capable of taking property expressly limited to the heirs of the body of the adopting parent or parents. . . .

*In re Fisler*, 133 *N.J.Eq.* at 423, 30 *A.*2d 894.

The New Jersey Supreme Court finally accepted the concept as the "stranger to the adoption" doctrine in the search for testamentary intent in *In re Wehrhane*, 23 *N.J.* 205, 128 *A.*2d 681 (1957). The court rejected the *Fisler* reasoning but reached the same result, that "issue" meant only children of the blood.

All parties are in accord that a provision for a 'child', 'children' or 'issue' of another is presumed not to include an adopted child or children [citations omitted]. The rule has general acceptance.

*Id.* at 208, 128 *A.*2d 681.

New Jersey courts also extended the "stranger to the adoption doctrine" to cover adult adoptees. *See, e.g., Adelung, supra.*

Our Supreme Court rejected *Wehrhane* as it related to "children" in *In re Coe*, 42 *N.J.* 485, 201 *A.*2d 571 (1964). There the court found that "children" did not presumptively mean only natural children. *Id.* at 493, 201 *A.*2d 571. The court held that an adopted child of a person named in a will is a child for purposes of a testator not related to the named person, and adopted children are entitled to take under a bequest to children of the named person. As will be discussed, however, in light of the later decisions in *Comly, Griswold* and *Nicol, infra*, however, *In re Coe* does not control.

In 1953, the Legislature eliminated the "stranger to the adoption" doctrine as it related to minors. 1953 *N.J.Laws* 264. Effective January 1, 1954 the new law read as follows:

In the construction of any testamentary or other document executed subsequent to the effective date of this act, an adopted child shall be deemed lawful issue of the adopting parent unless such document shall otherwise provide.

*Id.* The Legislature did not, however, modify the "stranger to the adoption" doctrine as it relates to the adult adoption statute. If the Legislature had intended to change or amend the adult adoption statute to allow adopted adults to take from strangers to the adoption, "it would have said so in clear and definite terms, as

it did with the change in the child adoption act in 1953." *In re Griswold*, 140 *N.J.Super.* 35, 58, 354 *A.*2d 717 (Morris County Ct.1976). The fact that the Legislature did not amend the adult adoption statute to conform with the amendment relating to minors "suggests a legislative intent to differentiate between the two types of adoption." *In re Nicol*, 152 *N.J.Super.* 308, 320, 377 *A.*2d 1201 (App.Div.1977). '

This court finds that the Legislature's failure to amend the adult adoption statute was not inadvertent. In fact Dean Clapp, author of New Jersey Practice, had suggested at the time:

The provisions of the adult adoption law, dealing with the effect of an adoption of an adult upon the inheritance of property and upon the taking of property under a will, should be amended to conform with the new act.

Alfred C. Clapp, *Review of the 1953 Legislative Year*, 8 *Rutgers L.Rev.* 20, 27 (1954). However, to this day the Legislature has not disturbed the adult adoption statute. The "stranger to the adoption" doctrine therefore remains good law as it relates to adopted adults in New Jersey.

There are three cases decided by the courts of this State which address the inheritance rights of adopted adults. *In re Nicol*, 152 *N.J.Super.* 308, 377 *A.*2d 1201 (App.Div.1977); *In re Griswold*, *supra*, 140 *N.J.Super.* 35, 354 *A.*2d 717 (Morris County Ct.1976); *In re Comly*, 90 *N.J.Super.* 498, 218 *A.*2d 175 (Gloucester County Ct.1966). In each of these cases the court found that an adopted adult was barred from inheriting from a stranger to the adoption. All three cases also recognized that adult and minor adoptions are to be treated differently with respect to the doctrine.

Ms. Heffner emphasizes that in both *Griswold* and *Comly* there was an express finding that the adult adoption was motivated to divert a remainder interest. The same concern was also underlying in the *Nicol* decision. Ms. Heffner thus seeks to distinguish these decisions from the instant case, where she contends there have been no allegations of an ulterior motive in the adult adoption. She contends the "stranger to the adoption" doctrine should be invoked to deny an adult adoptee benefits of a trust or will only where there has been a finding of fraud. If there is no finding of

fraud then the inclusionary principle enunciated in *In re Coe,* *supra,* 42 *N.J.* 485, 201 *A.*2d 571, should apply. Under that principle, an adopted child is presumed to be included in a testator's class gift unless the testator explicitly mandates to the contrary. *Id.* at 489, 201 *A.*2d 571.

This court rejects her contention. Rather, this court finds that the opinions in *Comly, Griswold* and *Nicol,* all decided subsequent to *Coe,* are controlling in this case.

In each of these cases, the court addressed the precise issue confronting this court, whether an adopted adult could take from a trust created by a stranger to the adult's adoption. In each case the court concluded that the adult adoptee could not take. Each specifically rejected the argument that *In re Coe* had any effect on the inheritance rights of adopted adults.

*In re Comly, supra,* 90 *N.J.Super.* 498, 218 *A.*2d 175 (Gloucester County Ct.1966), involved an adult adoption which was admittedly undertaken in order to convey an interest in property to the adoptee. *Id.* at 501, 218 *A.*2d 175. The court recognized *Coe* but rejected the adoptee's reliance upon it, finding "[t]here is no indication in that opinion that the children involved were adults at the time of their adoption.... it would appear that the court in *Coe* did not consider the adoption of adults in reaching its decision." *Id.* at 501–502, 218 *A.*2d 175.

Noting Chief Justice Weintraub's remarks in *Coe* about the likelihood that strangers to the adoption would accept the adopted parent-child relationship, the court stated:

> It would seem that this acceptance of the adopted child by third persons would not occur where the adopted "child" is a 36-year-old married woman with four children, who was adopted merely to give her an interest in the home in which she was living with her family.

*Id.* at 502, 218 *A.*2d 175. The court further held, upon review of the testatrix's will, that she plainly intended the trust to be used to benefit her brother's children during their youth, with final distribution at age thirty-five. The court found she "clearly" did

not envision or intend that someone would become a beneficiary at age thirty-six through use of the adult adoption statute. *Id.*

In *In re Griswold, supra,* 140 *N.J.Super.* 35, 354 *A.*2d 717 (Morris County Ct.1976), the testator established two separate trusts for the benefit of his sons, Alfred and Ely, during their lifetimes. The remainder of each trust was left to "such children or issue of deceased children" of each son as shall then be living, per stirpes. *Id.* at 38, 354 *A.*2d 717. Each trust provided for gifts over to the other trust in the event one of the sons died without leaving a child or issue of a deceased child. *Id.* The testator died in 1952. *Id.* Alfred died leaving four natural children, and Ely was divorced, having had no natural children. *Id.* Ely later remarried and adopted his second wife's adult son. *Id.* at 39, 354 *A.*2d 717. When Ely died, he was survived only by the adopted son, as his second marriage had also yielded no natural children. *Id.* The trustee sought instructions as to the final distribution of the trust. *Id.*

The court held that Ely's adopted son was not entitled to take from the trust. Specifically, the court found:

(2) The language of the will, together with the attending circumstances, require a conclusion that testator's probable intention would be to exclude the adopted adult as a child of testator's son Ely;

(3) The *Coe* case is not fully applicable to the situation of the adult adoptee and does not indicate or require a finding that there is a presumption that the adult adoptee would take as a "child" of the adopting parent under this testator's will.

*Id.* at 40, 354 *A.*2d 717. There was no reason, the court said, for either the testator or his counsel to think about the possibility of either of his sons adopting an adult. Relying on *In re Fisler, supra,* 133 *N.J.Eq.* 421, 30 *A.*2d 894, it appeared to be settled law and accepted at the time that even an adopted child would not take in these circumstances unless there was evidence of a contrary intent. *Griswold,* 140 *N.J.Super.* at 47, 354 *A.*2d 717. The idea, then, that a subsequently adopted adult could take would hardly have been entertained. *Ibid.* Moreover, the court pointed to specific attending circumstances which allowed them to infer

that the testator would not have included adopted adults in his gift. *Id.* at 42–46, 354 *A.*2d 717.

On the subject of *In re Coe,* the court found that the concepts upon which the decision was based are not necessarily applicable to an adult adoption.

Up until *Coe* the courts indicated the child adoption statute did not have that effect [allowing the adopted child to inherit] under the will of someone other than the adopting parent, and that was the accepted view. The adult statute would surely have been given the same interpretation. *Coe* reversed the interpretation because of the strong policy in favor of the equality of adopted children with natural children and perhaps of the "social desirability" of that result. There is no such strong policy in the case of an adult adoption, and the reason therefor not being present, the adult adoption statute should not have the same interpretation.

*Id.* at 54–55, 354 *A.*2d 717. The court stated that therefore "*Coe* should not control where the adoptee is an adult." *Id.* at 55, 354 *A.*2d 717.

The *Griswold* court also recognized, as this court has, that our Legislature made a significant statement on this issue when it failed to amend the adult adoption statute to conform with the amended child adoption statute, which eliminated the "stranger to the adoption" doctrine with respect to children. *Id.* at 57, 354 *A.*2d 717.

Finally, the court found that applying the *Coe* decision to adult adoptions would be an "open invitation" to fraud. *Id.* at 55, 354 *A.*2d 717. "Without safeguards ordinarily present in *child* adoptions, including the obligation of support, the risk is substantial and should not be taken." *Id.*

Most recently, the Appellate Division spoke on this issue for the first time in *In re Nicol, supra,* 152 *N.J.Super.* 308, 377 *A.*2d 1201 (App.Div.1977). *Nicol* is closest to the instant case in that the testatrix there specifically used, as did Mr. Duke, the words "issue (lineal descendants)".

The *Nicol* court reviewed the reasoning of *Griswold* and specifically approved of that decision. *Id.* at 319, 377 *A.*2d 1201.

It would be difficult to apply to such cases [of adult adoption] the sensible underlying considerations of *Coe* and *Thompson.* One would be hard-pressed to

434

ascribe to a testator, in the absence of any expression thereon or of clarifying attendant circumstances, a probable intent to include an adopted adult among the children or issue of a testamentary beneficiary. It is extremely unlikely that a testator would foresee the likelihood that his or her child, or any other prospective beneficiary, might at some time in the future adopt an adult. It is equally improbable that an adopted adult would be embraced in the bosom of the family members other than the adopting parent, as would an adopted child. We find nothing in the adoption statutes which would support a contrary view.

*Id.* The Appellate Division also recognized the significant lack of amendment to the adult adoption statue following the 1953 amendment to the child adoption statute.

Actually, the fact that at the time of the liberalizing revision of the child adoption law, particularly with respect to inheritance, comparable amendments were not made to the adult adoption law, suggests a legislative intent to differentiate between the two types of adoption.

*Id.*

The *Nicol* court further considered the fact that this case lacked the substantial attending circumstances which the *Griswold* court had partially relied upon to determine the testator's probable intent. The absence of such circumstances, the court said, in itself supported the inference that the testatrix did not intend to include adopted adults in her will. *Id.* at 320, 377 *A.*2d 1201.

The Appellate Division reversed the trial court, holding that the words "issue (lineal descendants)" did not include adopted children.

Thus, the three most recent reported New Jersey decisions on this issue have prevented adult adoptees from taking under a testamentary instrument created by a "stranger to the adoption". All three also specifically disapproved of *In re Coe.*

While Ms. Heffner correctly notes that in both *Comly* and *Griswold* the court found economic motives for the adoption, she erroneously concludes that it was this finding alone which determined the adult adoptee's inability to inherit. It is clear to this court that was not the case; rather, in both *Comly* and *Griswold* the court's findings of fraud merely confirmed its apprehension about allowing an adult adoptee to take.

Moreover, the Appellate Division's opinion in *Nicol*, where there was no evidence or finding of fraud, endorses the "stranger to the adoption" doctrine as a rule of construction.

█ The decisions in *Comly*, *Griswold*, and *Nicol* support this court's view that the "stranger to the adoption" doctrine should be applied to this case. This court finds that James B. Duke was a stranger to the adoption of Chandi Duke Heffner, the adult adoptee of Doris Duke. Accordingly, this court holds that Ms. Heffner is not a lineal descendent for the purposes of the 1924 Doris Duke Trust and grants summary judgment in favor of The Duke Endowment.

*Ms. Heffner's Motion to Remove the Trustees*

Ms. Heffner alleges that the Trustees of the Doris Duke Trust have waged a campaign to further the interests of the Duke Endowment at her expense and seeks their removal. She points to the fact that the Trustees, in filing this suit, indicated they did not believe she should take from The Trust, rather than simply seeking the court's guidance, as neutral Trustees should have done.

The court first notes that early in 1994, Ms. Heffner, in support of her application to the court to reserve her claims against the Trustees, stated:

[I]f the Trust is construed in the fashion sought by the Trustees, *i.e.*, that it should now be terminated in favor of The Duke Endowment, Ms. Heffner's claims against the Trustees for breach of fiduciary duties and conflict of interest will be rendered moot.... [T]he issue of removal of the Trustees is not ripe until it is definitively determined by the Court that Ms. Heffner is, in fact, the "lineal descendant" of Doris Duke.

Ms. Heffner thereby admitted that if this court determined that she could not take as a lineal descendant under The Trust, there would be no harm to her and no need for this motion. This court has, of course, made that determination, finding that Ms. Heffner does not qualify as a lineal descendant under the Doris Duke Trust. Ms. Heffner, however, reversed her position on the necessity of this motion based on the alleged acts of the Trustees,

discussed below, which she contends block her efforts to be included as a lineal descendant. The court will therefore address her motion.

Ms. Heffner divides her argument into six categories. First, she alleges that the Trustees sought to create favorable precedent that would undermine the rights of anyone whom Miss Duke might adopt. Second, she alleges the Trustees plotted to choose the best forum to defeat her claim. Third, she alleges the Trustees forged documents. Fourth, she alleges the Trustees should not advocate a position. Fifth, she contends the Trustees stand to benefit at her expense. Sixth, she alleges that the Trustees' argument is prohibited because they argued to the contrary in prior proceedings.

Ms. Heffner claims the Trustees, in prior construction proceedings, sought to exclude adoptees as beneficiaries. She also claims they purposely excluded adopted adults from the consent judgment in the Somerset County proceedings, which specifically recognized adopted children as lineal descendants. She claims this proves the Trustees' animus toward her.

The prior proceeding was brought for instructions by the court as to Articles Fourth and Fifth. That complaint does urge that adoptees not be permitted to take, and the matter was settled with a resolution as to adopted children only. No resolution was reached as to adopted adults. The consent judgment addressed only Article Fifth and specifically specified that interested parties reserved the right to seek a judicial construction of Article Fourth at a later time. *Certification II of Benjamin Michel* in support of defendant Heffner's cross-motion for removal, disqualification and to strike certain allegations at Exhibit 13.

Ms. Heffner alleges the Trustees had an obligation to inform Miss Duke of "probable consequences" to her of the consent judgment they received. Assuming, *arguendo*, she was not informed, since the settlement specifically applied only to Article Fifth, which did not affect Miss Duke, there was no such obligation.

The next question is whether the Trustees had an obligation to inform Miss Duke about the suit itself. Again, assuming she was not informed, the question is whether that alone, or together with the other arguments raised, is sufficient to disqualify the Trustees.

While the court can appreciate what Ms. Heffner is attempting to show, that the Trustees did not inform Miss Duke about the suit because they feared it might prompt her to adopt a minor, it is of no weight when Miss Duke herself is deceased. It was Miss Duke, if anyone, who was prejudiced by the Trustees' omissions, not Ms. Heffner.

Second, Ms. Heffner alleges that the Trustees plotted with counsel to choose the best time and forum to defeat Ms. Heffner. In support of this contention she relies upon various documents between the Trustees and their attorney which consist of legal advice as to whether they had standing in earlier suits, the law as to adoptees, etc.

One portion of the allegations is of some note. Dewey Ballantine's memorandum to the Trustees urges that they not intervene in a prior action since if Ms. Heffner is declared not to be a lineal descendent, Miss Duke might be spurred to adopt a minor at the expense of The Endowment.

This does show an intent to benefit The Endowment at the expense of the rightful takers of The Trust. However, again this court fails to see how it affects Ms. Heffner in any meaningful way since the prior proceeding was of no precedential benefit and since she cannot take. She is essentially arguing the interest of a potentially adopted child.

Third, Ms. Heffner alleges the Trustees and their counsel fabricated evidence, including a forgery of Miss Duke's signature. While much is made of this point, complete with conflicting handwriting experts, counsel for Ms. Heffner has admitted that there is no evidence that either the attorneys or the Trustees were involved in any wrongdoing. This argument is baseless. So too is

the argument that Miss Duke's 1992 affidavit was not notarized. There was no legal requirement for same to be notarized.

Fourth, Ms. Heffner contends the Trustees should not actively advocate the position that Ms. Heffner is not a lineal descendent as they have done in this proceeding. She also argues that the Trustees have failed to inform the court that the Trustees of The Endowment and The Trust are one and the same.

At all times this court was aware that the Trustees were one and the same, with the exception of Miss Duke, so there is no merit to that argument. With respect to Ms. Heffner's second point, that the Trustees have improperly advocated on behalf of The Duke Endowment and against the interests of Ms. Heffner, it is a trustee's duty to deal impartially with beneficiaries. *In re Koretzky*, 8 *N.J.* 506, 530, 86 *A.*2d 238 (1951). When there is conduct by a fiduciary toward a beneficiary which causes mutual animosity between them, a court may invoke its equity powers to remove the trustee. *Ibid.* Removal of a trustee, however, should be granted only sparingly. *Wolosoff v. CSI Liquidating Trust*, 205 *N.J.Super.* 349, 360, 500 *A.*2d 1076 (App.Div.1985). The decision is in the sound discretion of the court, and it will not be disturbed by an appellate tribunal in the absence of manifest abuse. *Ibid.* In order for hostility between a beneficiary and trustee to form the basis for removal, there must be evidence that the relationship is likely to materially interfere with the administration of the trust. *Id.* at 360–361, 500 *A.*2d 1076.

In this case, Ms. Heffner alleges that the Trustees are acting in their own self-interest, in derogation of her interests. Standards of utmost fidelity required of a fiduciary forbid the fiduciary to occupy a position in which its interests conflict with the estate. *Cohen v. First Camden National Bank & Trust Co.*, 51 *N.J.* 11, 18, 237 *A.*2d 257 (1967). She contends they have a substantial "direct economic motive" in this litigation, that being their right to compensation *ad infinitum* if The Endowment prevails. If Ms. Heffner prevails, she claims, the Trustees' right to commission from The Trust will cease. She cites numerous

cases for the principle that a trustee may not assume a position where he might benefit from violating his duty to the beneficiaries.

Preliminarily, the court notes that Ms. Heffner's assessment of the workings of The Trust is inaccurate. Under Article Second of the trust instrument, the Trustees' yearly compensation is limited to "one equal fifteenth part of three percent" of the yearly Trust income and profits. Mr. Joe L. Bookout, Secretary–Treasurer of The Trust, has certified that the Trustees will receive no financial benefit if The Endowment prevails in this litigation, because, while two-thirds of the Trust assets would pass to The Endowment, the Trustees have already been receiving commissions on the income generated by that money while it was part of The Trust. If and when the two-thirds passes to The Endowment, the Trustees' commissions will not increase but will remain the same as they will be generated from the same sum of money.

Furthermore, Mr. Bookout contends that in the event Ms. Heffner prevails in this litigation, the Trustees will not suffer any loss of commission. As a lineal descendant of Miss Duke, Ms. Heffner will be entitled to receive only the income generated by two-thirds of the assets of The Trust, until The Trust terminates under Article First. Under Article First, The Trust terminates twenty-one years after the death of the last surviving named beneficiary. Currently, there are nine beneficiaries remaining alive, ranging in age from seventy-one to ninety-one. Ms. Heffner will not receive her two-thirds share of the trust corpus until twenty-one years after the last of the nine remaining beneficiaries has passed away, and thus, despite Mr. Bookout's denial, it is possible that some of the present Trustees will benefit if The Endowment receives the money rather than Ms. Heffner. One can now see the wisdom of the Trustees maintaining a neutral stand.

A trustee has a duty to ensure that the estate is distributed in accordance with the testator's wishes and may seek instruction from the court when there is a valid doubt as to the testator's intent. *Howard Savings Institution v. Peep,* 34 *N.J.*

494, 499, 170 *A*.2d 39 (1961); *Fidelity Union Trust Co. v. Cavanagh*, 61 *N.J.Super.* 96, 100, 160 *A*.2d 308 (Ch.1960), *rev'd as to construction of will, Fidelity Union Trust Co. v. Robert*, 67 *N.J.Super.* 564, 171 *A*.2d 348 (App.Div.1961), *modified on other grounds*, 36 *N.J.* 561, 178 *A*.2d 185 (1962). However, in a dispute between two parties claiming to be beneficiaries, a trustee may not advocate for either side or assume the validity of either side's position. *In re Cudahy*, 26 *Wis.*2d 153, 131 *N.W.*2d 882, 885 (1965). Unless the trust instrument itself provides otherwise, a trustee's duty to each beneficiary precludes it from favoring one party over another. *Northern Trust Co. v. Heuer*, 202 *Ill.App.*3d 1066, 148 *Ill.Dec.* 364, 367, 560 *N.E.*2d 961, 964 (1990); *In re James' Estate*, 86 *N.Y.S.*2d 78, 89 (Surr.Ct.1948). A trustee has a duty to deal impartially with all beneficiaries and to protect all of their interests. *Northern Trust, supra*, 148 *Ill.Dec.* at 367, 560 *N.E.*2d at 964. When a dispute arises, the trustee should merely file an interpleader action to avoid acting at its own peril. *Id.*

 Under the above cited case law, it is clear that the Trustees here may have acted improperly in advocating for The Endowment's position. Had The Endowment been unrepresented, the Trustees could have set forth their position. The Trustees claim their advocacy was limited to a statement in the complaint to the effect that their counsel had concluded that Ms. Heffner was not a lineal descendant. It is clear to the court, however, that the Trustees went further than this and in fact argued that she be prohibited from taking from The Trust.

It was improper for the Trustees to advocate The Endowment's position when The Endowment had competent counsel to represent them. Nevertheless, as this court has already determined that Ms. Heffner is not Miss Duke's lineal descendant as a matter of law, there can be no actual harm to her.

Fifth, Ms. Heffner contends there have been attempts to block evidence. The only motion brought in this case regarding discovery was settled by consent. No further motions have been made. Ms. Heffner has acquiesced in the limits set by the Trustees. If

in fact she believed she was being purposefully deprived of discovery, the proper course of action would have been for her to bring a motion.

Finally, Ms. Heffner argues that the Trustees' arguments in this case contradict prior positions of the Trustees and their counsel, and they should therefore be barred from asserting them. The Trustees had sought a determination that adoptees could not take in the Somerset County proceeding. Two cases are noted: *Cocke v. Duke University*, 260 *N.C.* 1, 131 *S.E.*2d 909 (1963) and *Davison v. Duke University*, 282 *N.C.* 676, 194 *S.E.*2d 761 (1973). In *Cocke*, the Trustees of The Endowment argued that the economic conditions in 1962 required a more diversified portfolio than permitted by the instrument. In *Davison*, the Trustees sought permission to make changes due to the passage of certain tax legislation which materially affected the income of The Trust.

Mr. Michel contends on page 2 of his certification, filed May 8, 1995, that the Trustees argued in *Cocke* that the substantive law governing the case was found in *N.J.S.A.* 3A:15–15, a statute passed in 1937, despite the fact that Article Eighth referred to "present existing laws and statutes of New Jersey". This is not entirely accurate. The Trustees' brief in *Cocke* argued that either that statute be used or, in the alternative, that the statute merely codifies the common law in existence in 1924, which common law gives the court authority to grant the relief sought. The Trustees also argued the statute had retroactively changed the law.

*Cocke* dealt with the interpretation of the trust creating The Duke Endowment, not the Doris Duke Trust. It is correct that the Trustees of The Endowment urged that Article Eighth, referring to "present existing laws and statutes" of New Jersey, was a general choice of laws provision and was not applicable to the specific investment provision of Article Third. While clearly there is a similarity to our case, where The Endowment now urges that "present existing law applies" it cannot be said that the principals of judicial estoppel bar the present argument. There was not a

similarity of issues before the court sufficient to call the doctrine into play.

 *Davison* dealt with an entirely different scenario, where the passage of tax legislation affected The Endowment. The Trustees urged that Mr. Duke would not have intended the result caused by the act. In fact, the act evidently prohibited the Trustees from making certain investments mandated by the instrument. The Trustees argued that the statute merely codified the common law and cited cases in support of this proposition. Ms. Heffner argues that since the Trustees of The Endowment urged the court to take into account Mr. Duke's intent under those circumstances, they are now prohibited from objecting to such proof being submitted by Ms. Heffner. This court does not agree.

 An essential element of judicial estoppel is the unequivocal assertion of law or fact by a party in a judicial proceeding. *Levin v. Robinson, Wayne & LaSala, supra*, 246 *N.J.Super.* 167, 586 *A.*2d 1348 (Law Div.1990). Neither in *Cocke* nor in *Davison* did The Endowment "unequivocally" argue that 1924 law not be applied. As to proof regarding intent, the underlying circumstances of *Davison* and this matter are not the same. This case deals with an interpretation of the testator's words, not a determination as to his probable intent.

Based upon the foregoing, Ms. Heffner's motion to remove the Trustees is denied.

Next, Ms. Heffner contends that the law firm of Dewey Ballantine must be disqualified from representing the Endowment in this matter since it has earlier represented The Trustees. The Trustees are represented in this proceeding by Pitney Hardin Kipp & Szuch.

From the papers submitted it seems clear that both the Trust and the Endowment have been represented by the same law firms for most of their existence. Separate counsel is evidently chosen on occasions, when both appear in court and their interests potentially diverge.

In addition to this objection Ms. Heffner argues that Dewey Ballantine has been "running the show", preparing witnesses and making decisions regarding discovery, arguing motions on behalf of The Endowment and the Trustees and supplying legal advice that benefits The Endowment at the expense of the trust beneficiaries. Early briefs implied there was some involvement in an alleged "forgery", although this very serious allegation has been abandoned as to the law firm and the Trustees themselves. She also relies upon the six grounds for removal of the Trustees.

Ms. Heffner alleges Dewey Ballantine's continued representation of the trust violates RPC 1.7. That rule prohibits an attorney from representing a client where the interests of one client are directly adverse to the interest of another client, unless there is full disclosure of the conflict.

RPC 1.7 Conflict of interest: General Rule

(a) A lawyer shall not represent a client if the representation of that client will be directly adverse to another client unless:

(1) the lawyer reasonably believes that representation will not adversely affect the relationship with the other client; and

(2) each client consents after a full disclosure of the circumstances and consultation with the client, except that a public entity cannot consent to any such representation.

(b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interest, unless:

(1) the lawyer reasonably believes the representation will not be adversely affected; and

(2) the client consents after a full disclosure of the circumstances and consultation with the client, except that a public entity cannot consent to any such representation. When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved.

© This rule shall not alter the effect of case law or ethics opinions to the effect that:

(1) in certain cases or categories of cases involving conflicts or apparent conflicts, consent to continued representation is immaterial, and

(2) in certain cases or situations creating an appearance of impropriety rather than an actual conflict, multiple representation is not permissible, that is, in those situations in which an ordinary knowledgeable citizen acquainted with the

facts would conclude that the multiple representation poses substantial risk of disservice to either the public interest or the interest of one of the clients.

Ms. Heffner cites a number of well known legal principals. An attorney must have complete loyalty to his client, and if there are any real or potential conflicts waivers must be obtained. *In re Dolan*, 76 *N.J.* 1, 384 *A.*2d 1076 (1978). An attorney must avoid circumstances where there is even an appearance of potential conflict. *Clark v. Corliss*, 98 *N.J.Super.* 323, 237 *A.*2d 298 (App.Div.1967). Conflict rules are strictly interpreted. Dual representation of adverse parties is impermissible in the absence of consent to representation. *Aysseh v. Lawn*, 186 *N.J.Super.* 218, 452 *A.*2d 213 (Ch.Div.1982). A conflict need not be obvious or actual; the mere possibility of conflict at the beginning of a relationship is enough to establish an ethical breach. *Haynes v. First Nat'l State Bank of N.J.*, 87 *N.J.* 163, 432 *A.*2d 890 (1981).

Ms. Heffner alleges Dewey Ballantine must be disqualified from representing either The Endowment or the Trustees. None of the cases she has cited support her standing to bring this motion. The cases arise from instances where one of the two represented parties felt an injustice was done. Here neither the trust nor the endowment have joined in her application. Ms. Heffner cites *Manoir–Electroalloys Corp. v. Amalloy Corp.*, 711 *F.Supp.* 188 (D.N.J.1989), for the proposition that a *per se* rule of disqualification should apply. She neglects to note that Judge Barry suggested such a rule in circumstances where the original client did not consent and indeed brought the motion to disqualify. Based upon this court's decision she is merely an unsuccessful claimant without standing to bring this application.

Ms. Heffner's strongest argument in support of her position that she has in some way been harmed by the prior dual representation is that Dewey Ballantine somehow has control over the discovery process. As I have stated earlier, no motion was made for discovery, save the motion which was resolved by consent. Ms. Heffner therefore cannot now complain.

In summary, while this court recognizes the potential for conflict, neither of the parties who would suffer from the conflict have complained. This court has ruled Ms. Heffner is not entitled to take under the terms of The Trust. The court has examined her claims to determine whether she was in any way harmed by Dewey Ballantine's prior dual representation and continuing representation and finds that she was not. Her claims are without merit.

Accordingly, Ms. Heffner's motion to disqualify Dewey Ballantine is denied.

Based upon the foregoing, Ms. Heffner's motion to strike the allegations of the complaint is denied as moot.