901 A.2d 455

IN THE MATTER OF THE ESTATE OF MARIA FENTON.

Superior Court of New Jersey
Appellate Division

Argued May 22, 2006—Decided July 13, 2006.

Before Judges LINTNER, PARRILLO and HOLSTON, JR.

*Marvin J. Brauth,* argued the cause for appellants, Elinor F. Marshall, Harriet Fenton Parks, Carroll D. Knott, Lindsay Dryden, III, Randolph Fenton, Jr., Glenn Thorton, Sydnie Thornton Smith, Heather Thornton, Matthew C. Fenton, III, Thomas T. Fenton, and Philip S. Fenton (*Wilentz, Goldman & Spitzer,* attorneys; *Mr. Brauth,* of counsel; *Mr. Brauth* and *Jeffrey J. Brookner,* on the brief).

*Gerard G. Brew,* argued the cause for respondents, Elizabeth Chandler Lauriault Pierson, Sally Vaughan Lauriault Morris, and Bruce Lea Lauriault (*McCarter & English,* attorneys; *Mr. Brew* and *Robert A. Mintz,* of counsel; *Mr. Brew* and *Mr. Mintz* and *Tammy L. Meyer,* on the brief).

The opinion of the court was delivered by

**PARRILLO, J.A.D.**

The parties to this appeal are beneficiaries under a trust created by Foster Fenton. Defendant beneficiaries appeal from a May 6, 2005 summary judgment declaring plaintiff beneficiaries to be the validly adopted children of Maria Fenton (Maria) for all purposes, including any rights that her issue enjoy under the trust agreement. For reasons that follow, we affirm.

By way of background, on November 29, 1966, the settlor, Foster Fenton (Foster), created a revocable deed of trust which he subsequently amended five times: July 31, 1968; July 15, 1969; March 4, 1971; August 18, 1971; and March 3, 1972. The trust named Hillary Gans and Mercantile–Safe Deposit & Trust Company (Mercantile) as the trustees. Foster signed the original trust and all of the amendments in Maryland, and was a resident of Maryland at the time of his death in 1974. Gans also resided in Maryland, and Mercantile's principal office was located there. By its own terms, the trust was governed by Maryland law.

The trust provided that Foster would receive the entire net income of the trust estate as long as he lived. Thereafter, the trust income would be paid to his wife, and upon her death, to Foster's four brothers and their widows. After the brothers and widows passed away, one-tenth of the net income would be paid to each of Foster's then-living nieces and nephews.

Upon the death of the nieces or nephews, their respective shares of the trust income would pass to the deceased's "issue". If there were no living issue, then that beneficiary's portion of the income would be shared by the remaining beneficiaries. The trust further provided that twenty-one years after the death of the last niece or nephew, the trust principal would be distributed to the remaining beneficiaries and their issue per stirpes.

Specifically, Article II, as amended on August 18, 1971, provided in relevant part:

(c) A one-tenth portion of net income ... shall be paid to each niece or nephew of the Settlor who survives the Settlor for her or his remaining life. Upon the death of any such niece or nephew, and in the case of any niece or nephew who is not

living when the said portion of such income would otherwise be payable to her or to him, such portion shall be paid to the issue of such deceased niece or nephew living from time to time as the income is payable, per stirpes and not per capita, such issue taking the portion of income the deceased niece or nephew would have received if living. If there are no such living issue, the portion shall be paid, per stirpes and not per capita, to (i) the nieces and nephews and (ii) the issue of any deceased niece or nephew who are living at the time the income would otherwise be payable to such deceased niece or nephew.

The trust definitions for child, children and issue provided that "child" or "children" meant

lawful blood descendants in the first degree of the parent designated, and references to "issue" mean lawful blood descendants in the first, second, or any other degree of the ancestor designated, provided always, however, that *an adopted child and such adopted child's lawful blood descendants shall be considered in this instrument as lawful blood descendants of the adopting parent or parents* and of anyone who is by blood or adoption an ancestor of the adopting parent or of either of the adopting parents. . . .

[(emphasis added).]

However, the trust expressly excluded any child adopted by any of the settlor's brothers after the date of execution of the trust agreement.

Maria was Foster's niece, a natural daughter of one of Foster's brothers. She resided in Bethlehem Township, Hunterdon County. Maria's only marriage was annulled in 1953, and she had no natural children. In 1991, when she was sixty-years old, Maria adopted four adults: plaintiffs, Bruce Lea Lauriault, Sally Vaughan Lauriault and Elizabeth Chandler Lauriault Pearson, and Virginia Lewis Lauriault, who predeceased Maria. They were the orphaned children of Maria's first cousin; their grandmother was Maria's mother's sister.

Prior to the adoption, on September 18, 1990, Maria's attorney informed the corporate trustee, Mercantile, that Maria was contemplating the adult adoptions and sought the advice of its legal department as to whether the adoptions would entitle the adult adoptees to be beneficiaries under the trust. Specifically, Maria's attorney wrote:

I represent Maria B. Fenton who has contacted me concerning the possibility of adopting four adult persons so they might succeed to the income paid under the trust upon the death of Miss Fenton.

My reading of Article II of the Foster T. Fenton Revocable Trust Agreement leads me to conclude that persons adopted by Miss Fenton can succeed as income beneficiaries upon her death.

In his letter dated October 11, 1990, Frank W. Waxman, Mercantile's vice president, agreed that upon her death, Maria's trust income would be paid per stirpes to the adoptees who survived her.

At the adult adoption hearing on July 26, 1991, Maria testified that she had known the four adults "since they were born." Bruce testified that he lived in Georgia and had known Maria since 1974, but that his "major contact" with her "in the last 15, 16 years" took place three years previously at his grandmother's ninetieth birthday party. Sally, who also lived in Georgia, first met Maria in 1988 and since then had maintained contact with her mostly by telephone. Elizabeth and Virginia testified that they had recently met Maria. For about a year prior to the adoption hearing, Elizabeth and Maria exchanged telephone calls, letters, and pictures. Virginia and Maria exchanged telephone calls "for about a year or two."

At the hearing, Maria told the court that she was seeking the adoption because she wanted to have a "nice, close family" and had no children of her own. Maria also told the court that she received about $30,000 a year as a beneficiary under a Maryland trust agreement and that her adopted adult children would receive something under the trust after she died. Based upon the testimony and pleadings, the court was satisfied that the statutory requirements were met and entered a judgment of adoption on July 16, 1991.

On March 3, 1992, Maria's attorney delivered to Mercantile copies of the final judgment and amended birth certificates. In his transmittal letter, the attorney wrote: "Now that Maria B. Fenton has adopted these four persons, it is my understanding they will be considered her children with respect to the trust agreement of the late Foster T. Fenton." On May 20, 1992, W.C. Smith at Mercantile sent a response confirming that under then-

existing law, the adoptees would take under the trust. Specifically, on behalf of the corporate trustee, Smith wrote:

> While I agree with the reasoning and conclusion based on the facts and the law that existed as of the date of his [Waxman's] letter to you, we have no way of knowing how the term "issue" will be defined when this trust terminates. If, at that time, there is any doubt whatever, we will ask counsel for the trust to give us a written opinion and may well ask an equity court for construction.

On February 28, 1991, prior to the adoption judgment, but consistent with her stated desire to treat plaintiffs in every respect as her children, Maria executed a last will and testament (1991 will) that bequeathed to the adult adoptees a one-sixth share of the "rest, residue and remainder" of her estate. After the adoptions, Maria executed a codicil dated December 6, 1991, stating:

> I have adopted four adults, Bruce Lea Lauriault, Sally Vaughan Lauriault Wright, Elizabeth Chandler Lauriault Pierson and Virginia Lewis Lauriault, to create a relationship of parent to these four persons pursuant to Judgment for Adoption of Adults. . . .

On April 19, 1993, Virginia died without issue. In Maria's last will and testament dated May 17, 2002 (2002 will), she included bequests to plaintiffs. Specifically, Maria bequeathed: to Bruce, her stock in Home Depot, Inc.; and to Sally and Elizabeth, one-third of her residual estate. Maria was receiving trust income before she died on June 1, 2002.

Maria's siblings, whose percentage shares as trust beneficiaries were affected by the adult adoption, maintained that Maria's action was intended to minimize their interest in trust income. Her brother Randolph attributed her hostility to events occurring in the aftermath of their father's death. According to Randolph, in the early 1980's, Maria expressed concern that she would be written out of their father's will. At her suggestion, Randolph, Maria, and their sister, Nannette, agreed in writing that they would share equally their respective portions of their father's estate without regard to the distribution in his will. After their father died and left the bulk of his estate to Maria, she apparently

filed a lawsuit contesting the agreement with her siblings. She did not prevail, however, and the siblings each inherited a third of their father's estate, which included the trust income.

Consequently, on December 13, 2002, defendant trust beneficiaries (defendants) filed a federal court action seeking a declaratory judgment that the adoption judgment was invalid with regard to the trust and that the three surviving adult adoptees had no right to, or interest in, Maria's share of the trust's income or principal. Defendants also sought permanent restraints enjoining plaintiffs from filing any proceeding with respect to the trust in either Maryland or New Jersey, which relief was denied. On plaintiff adoptees' (plaintiffs) motion, the court dismissed the complaint pursuant to *Fed.R.Civ.P.* 12(b)(6). Specifically, the court found that it lacked jurisdiction to determine the validity of the State Court adoption judgment and that due process did not require notice to them of the adoption proceedings back in 1991, even though it is plausible that defendants had constructive notice of the adoption. Defendants appealed to the Third Circuit.

In the meantime, on October 7, 2003, plaintiffs filed the present complaint and order to show cause in the Chancery Division, Probate Part, Hunterdon County, seeking a declaration that the adoption judgment remained in effect and was valid for all purposes. On defendants' motion, however, the matter was removed to federal district court where plaintiffs then moved for a remand to the Chancery Division. The court stayed the matter pending the outcome in the Third Circuit. In its June 15, 2004 decision, the Third Circuit affirmed the dismissal of count II of defendants' complaint, asserting denial of federal due process, but vacated the judgment and remanded the case as to the state law claims in count I. *Marshall v. Lauriault*, 372 *F.*3d 175, 184, 186–87 (3d Cir.2004). As to the latter, the Third Circuit held that the district court "abstain from deciding [the] declaratory judgment claim" if it felt that the state law questions were "better suited for resolution in state court...." *Id.* at 184. Without reviewing the Mary-

land [1] and New Jersey complaints to verify that the state claims would address all of the issues presented in the federal court action, the Third Circuit remanded the issue for further consideration.

On remand, the district court abstained from resolving the remaining state law claims identified by the Third Circuit. Instead, the district court ordered that all remaining issues were to be litigated in the New Jersey action and consequently, on October 12, 2004, the district court entered a consent order remanding the matter to the Chancery Division, Probate Part.

Actually, the only real issue before the trial court was the validity of Maria's adult adoptions. Following defendants' answer, plaintiffs moved for summary judgment. In granting the relief, the court found that the 1991 adult adoptions in issue complied in all respects with the New Jersey adult adoption statute, *N.J.S.A.* 2A:22–1 to –3, and that under Maryland law, the motives for these adoptions may not be scrutinized. Nevertheless, the court found that all of Maria's motives were permissible, including her desire "to have a nice close family, her desire to provide for her adopted children to inherit from her, and her desire that her adopted children be treated as natural children for inheritance tax purposes." Consequently, contrary to defendants' suggestion, it was neither Maria's sole nor primary purpose to give her adopted children an interest in the trust as to divest defendants of their respective lawful shares.

Noting that Foster knew how to exclude certain classes of adoptees, the court specifically referenced Article III of the trust agreement and found that

[I]f one of his *brothers* adopted children *after* the execution of the Trust Agreement, that adopted child of a brother would not take. He imposed no such limitations, however, on his nieces, nephews, or any other issue.

[Indeed,] [t]he [s]ettlor expressly permitted his nieces or nephews to adopt.

---

[1] In addition to the present action, plaintiffs filed a claim in Maryland state court (the Maryland case) seeking to compel the trustees to make distributions to them from the trust.

Accordingly, the court concluded that Foster never gave defendants the interest they claimed was wrongfully taken from them by Maria, but instead conferred on each trust beneficiary, including Maria, the right to adopt children, which included both adults and minors, as provided by Maryland law.

Finally, the court rejected defendants' notice claims, as the Third Circuit previously had done. *Marshall, supra,* 372 *F.*3d at 185–87. The court similarly found that the adult adoption statute did not require notice to third parties other than the spouse of the adoptive parent, *N.J.S.A.* 2A:22–1, and that the statute did not require notice to third parties whose interests in property might be tangentially affected by the adoption.

On appeal, defendants raise the following issues:

I. The Adult–Adoption Decree should be set aside because its principal purpose—to alter the distribution of Foster's assets—is contrary to New Jersey's public policy.

    A. This collateral attack upon the validity of the Adult–Adoption Decree is governed by New Jersey law.

    B. Under New Jersey law, adult-adoption proceedings are closely scrutinized, and are disallowed if found to be motivated by a desire to alter the distribution of a third party's assets.

    C. The Adult–Adoption Decree is void because it was procured for an improper purpose—diversion of the Trust's assets.

II. Defendants had standing to lodge a collateral attack upon the Adult–Adoption Decree and did so on a timely basis.

    A. Defendants had standing to contest the original Adult–Adoption proceedings, but were unable to do so because they did not receive notice.

    B. Defendants' collateral attack on the Adult–Adoption Decree is not barred by laches because the attack was filed soon after it became ripe, and soon after Defendants learned of their rights.

Defendants collaterally attack the validity of the adult adoption because their claimed primary purpose—to alter the distribution of trust assets—is contrary to New Jersey's public policy. Essentially, defendants' argument is twofold: (1) the trial court erred by applying only the statutory requirements for adult adoptions under New Jersey law; and (2) the trial court erred by failing to closely scrutinize the adult adoptions for improper purpose. We disagree.

■ In New Jersey, "[t]he right to adopt, either an infant or an adult, is available only by statute and is not a creation of the common law." *In re the Adoption of an Adult by G.V.C.,* 243 *N.J.Super.* 651, 653, 581 *A.2d* 123 (Ch.Div.1990). "[T]he [New Jersey] adult adoption statute is remarkably brief and succinct." *In re the Adoption of an Adult by C.K.,* 314 *N.J.Super.* 605, 609, 715 *A.2d* 1030 (Ch.Div.1998) (citing *N.J.S.A.* 2A:22–1 to –3). With respect to the criteria for adult adoptions, *N.J.S.A.* 2A:22–1 provides the standards, stating:

> The superior court shall allow an unmarried person of full age, a husband with his wife's consent, a wife with her husband's consent or a husband and wife jointly to adopt an adult person and may change the name of the adult, if the court is satisfied that the adopting parent or parents are of good moral character and of reputable standing in their community, and that the adoption will be to the advantage and benefit of the person to be adopted.
> 
> [*N.J.S.A.* 2A:22–1.]

*N.J.S.A.* 2A:22–2 outlines additional requirements for granting an adult adoption:

> Such adoption shall not be granted, unless the adopting parent or parents are at least 10 years older than the person to be adopted and the latter has, in writing acknowledged by him as deeds are required to be acknowledged, requested the adoption and, if desired, the change of name. The court, upon being satisfied that the best interests of the person to be adopted would be promoted by granting the adoption, may waive any and all of the above requirements. Every such waiver shall be recited in any judgment of adoption thereafter entered.
> 
> [*N.J.S.A.* 2A:22–2.]

■ The adult adoption statute reflects the State's public policy of allowing "adoption[s] between consenting persons, with the ability to enter a contract, when there is a strong benefit to be gained." *In re the Adoption of an Adult by G.V.C., supra,* 243 *N.J.Super.* at 653–54, 581 *A.2d* 123; *accord In re the Action of M. for the Adoption of P., an Adult,* 193 *N.J.Super.* 33, 37, 471 *A.2d* 1220 (Ch.Div.1983) ("The purpose of [the adult adoption statute] was to permit adults who are qualified to enter a contract to obtain the sanction of law to enter into a mutually beneficial adoptive relationship."). "The [statute's] emphasis on good moral character ... indicate[s] the legislature's interest in avoiding adoptions [of adults] based on sham or fraud." *In re the Adoption*

*of an Adult by G.V.C., supra,* 243 *N.J.Super.* at 654, 581 *A.*2d 123. By limiting the requirements, the " '[a]doption of adults is ordinarily quite simple and almost in the nature of a civil contract.' " *In re the Account of the Tr. of the Estate of Nicol,* 152 *N.J.Super.* 308, 319, 377 *A.*2d 1201 (App.Div.1977) (quoting *In re the Estate of Griswold,* 140 *N.J.Super.* 35, 52, 354 *A.*2d 717 (Cty.Ct.1976)).

■ Applying the limited requirements here, the statute mandates: (1) that Maria was at least ten years older than plaintiffs; (2) that Maria was of good moral character and of reputable standing in the community; (3) that the adoption was to plaintiffs' advantage and benefit; (4) that plaintiffs requested the adoption and, if desired, the change of names; and (5) that the adoptions promoted the best interests of plaintiffs.

It is undisputed that Maria satisfied New Jersey's statutory requirements. At the time of the adoption hearing on July 26, 1991, Maria was sixty-years old and plaintiffs were thirty-seven-years old (Bruce), thirty-five-years old (Sally), and thirty-three-years old (Elizabeth). Maria had no children of her own, and by virtue of her age, would not have any in the future. Maria told the court that she was seeking the adoption because she wanted a "nice, close family". There is nothing in the record to suggest that she was not of good moral character and of reputable standing in the community.

There also is no factual dispute that the statutory requirement that the adult adoptions "be to the advantage and benefit" of plaintiffs has been satisfied. *N.J.S.A.* 2A:22–1. At the time of the adoption hearing, plaintiffs' parents were deceased. Maria acknowledged that she would be their mother. Although plaintiffs did not have an ongoing relationship with Maria until one to three years prior to the adoption proceeding, they expressly consented to the adoptions at the hearing and understood that they would be entering into a parent-child relationship with Maria. Additionally, they acknowledged in writing their desire to be adopted, and their willingness to change their names. Maria and plaintiffs main-

tained their parent-child relationships for eleven years until Maria died in 2002.

Plaintiffs also benefited financially from the adoption. Although New Jersey's "stranger to the adoption" provision, *N.J.S.A.* 2A:22–3c, a, "creat[es] a presumption that an adopted child could not take property under an instrument created by someone other than the adoptive parent," that presumption disappears when "the instrument itself indicate[s] a specific intent that the adopted child should take." *In re the Trust for the Benefit of Duke,* 305 *N.J.Super.* 408, 428, 702 *A.*2d 1008 (Ch.Div.1995), *aff'd o.b.,* 305 *N.J.Super.* 407, 702 *A.*2d 1007 (App.Div.), *certif. denied,* 151 *N.J.* 73, 697 *A.*2d 546 (1997). Here, of course, the trust expressly defines children of beneficiaries to include adopted children and thus plaintiffs, upon Maria's death, will receive her share of trust income of $30,000 per year.

Despite Maria's satisfaction of all statutory requirements, defendants nevertheless contend that the adult adoption is invalid because its primary purpose was to alter the distribution of third-party assets and, therefore, violated New Jersey law. This argument fails for several reasons.

In the first place, New Jersey does not require adoptive parents to indicate their reasons for the adoption. *N.J.S.A.* 2A:22–1 to –3. To be sure, courts are "mindful of the possibility of fraud." *In re the Action of M. for the Adoption of P., an Adult, supra,* 193 *N.J.Super.* at 37, 471 *A.*2d 1220. "The prospect [of fraud] is not so remote with respect to adult adoptions" because they lack "safeguards ordinarily present in *child* adoptions" such as "the obligation of support...." *In re the Estate of Griswold, supra,* 140 *N.J.Super.* at 55, 354 *A.*2d 717. The court below, however, expressly found there to be no fraud perpetrated in Maria's adoption of plaintiffs, concluding:

> At the adoption hearing Maria indicated that she had no children of her own and wanted a close family. Adopting second cousins is a reasonable act toward this goal, especially considering the adoptees no longer had parents of their own. At the hearing Maria also stated that the adoptees would become beneficiaries to the

trust income and accede to other inheritance rights pursuant to being lawfully adopted. There were no facts elicited stating that Maria's sole reason for the adoption was that the adoptees receive trust income and, even if that was her sole motive, this Court is not required to annul the adoption based on that reasoning.

Furthermore, in rejecting defendants' challenge to the adoption judgment because it gave the adoptees inheritance rights in a family trust, the general equity judge reasoned:

That argument is contrary to the language of the statute that expressly addresses the inheritance rights created by adult adoption; *N.J.S.A.* 2A:22–3. New Jersey law did not and does not require the complainant—the complaint to recite all interest that an adoptee would succeed to in a trust or even specifically name the trust in question.

We find no error in this reasoning.

In support of their claim of improper purpose, defendants rely on cases clearly distinguishable from this matter, mostly involving issues of a grantor's or testator's probable intent to include adoptees within the class of takers, which otherwise was not clear from the face of the instrument. The one exception is *In re the Action of M. for the Adoption of P., an Adult,* in which the adoption was denied because, unlike here, the adoptive parent failed to satisfy the statutory requisite that the adoption was for the benefit of the proposed adult adoptee. *In re the Action of M. for the Adoption of P., an Adult, supra,* 193 *N.J.Super.* at 38, 471 *A.*2d 1220. In that case, a twenty-nine year-old assistant university professor sought to adopt his nineteen year-old first cousin who was a university student and a Greek national on a foreign student visa. *Id.* at 35, 471 *A.*2d 1220. Although the plaintiff satisfied the statutory requirements of age and character, the court found that the only advantage or benefit to the prospective adoptee was the free tuition that he would gain at the university by virtue of being the son of a university professor. *Id.* at 36, 471 *A.*2d 1220. Because the adoptee planned to return to his natural family in Greece after finishing his education, the court concluded that the adoption was "transitory, without bona fides and with no apparent permanent purpose" and therefore "would promote what amount[ed] to a fraudulent aim." *Id.* at 38, 471 *A.*2d 1220. The court further concluded that the secondary motive for "main-

tain[ing] a close familial relationship" could "be accomplished without an adoption" and did not "detract from the fraudulent motive." *Id.* at 37–38, 471 *A.2d* 1220.

As noted, the other cases relied on by defendants are trust construction matters in which courts have addressed the effect of adult adoptions on interests in trusts and estates where the relevant instrument was silent as to the settlor's or testator's intent. For instance, in *In re the Estate of Comly,* 90 *N.J.Super.* 498, 218 *A.2d* 175 (Cty.Ct.1966), the court denied the complaint for distribution of trust funds to an adult adopted "for the sole purpose of [obtaining] an interest in property." *Id.* at 503, 218 *A.2d* 175. There, the adopted daughter of the testatrix's half-brother brought an action to compel distribution of her portion of a trust fund established in the testatrix's will, probated in 1936. *Id.* at 499–500, 218 *A.2d* 175. At the time of the adoption in 1965, plaintiff was thirty-six years-old and married with four children. *Id.* at 501, 218 *A.2d* 175. The court determined that the *sole* purpose of the adoption was to enable plaintiff and her family to remain in a home that they occupied in which her father (adopted) was given a life interest under his mother's will with the remainder going to his children. *Ibid.* Specifically, the court "noted that a few days after the adoption ... demand was made upon the trustee for [the adoptee's] 'share' of the trust, and [that the] action to compel distribution was commenced only two months after the adoption." *Ibid.* Significantly, in construing the provision of the will to ascertain and give effect to the testatrix's probable intent, the court found it unlikely that the testatrix "envision[ed] that her half-brother's 'children' would include an adopted adult." *Id.* at 502, 218 *A.2d* 175.

Likewise, in *In re the Estate of Griswold, supra,* 140 *N.J.Super.* at 60, 354 *A.2d* 717, the issue was the effect of an adult adoption on a New Jersey will. The court found that "the primary motive for the [adult] adoption was to gain the benefit of the trust remainder for [the adoptive parent's] wife and her son", thereby "divert[ing] [it] from the children of [the adoptive parent's broth-

er]." *Id.* at 63, 354 *A.2d* 717. However, nothing in the testator's will itself nor in the surrounding circumstances established that the subject of adult adoptees as "children" was ever discussed by the testator. *Id.* at 64, 354 *A.2d* 717. Under these circumstances, the court concluded that enforcement of a presumption treating adult adoptees the same as natural children would violate the testator's intent and constitute an abuse of the will. *Id.* at 60, 354 *A.2d* 717.

In fact, the only New Jersey case to squarely address the reasons underlying an adoption distinguishes between motive and the probable intent of a testator. *In re the Account of the Tr. of the Estate of Nicol, supra,* 152 *N.J.Super.* at 312, 377 *A.2d* 1201. Although its denial of inheritance rights to an adopted adult ultimately turned on the probable intent of the testator, who would unlikely have foreseen the possibility of her married son adopting an adult in the future, the court specifically noted that its holding would probably have favored the adoptee if the question was one of motive for the adoption:

> If the result reached below had turned solely on the issue of Alexander's motive in adopting his stepchildren, we would be less inclined to disturb it, even though we suspect, notwithstanding the absence of any fraudulent intent, that Alexander's probable motive was to assure their sharing in the distribution of his mother's testamentary trust.
>
> [*Id.* at 312, 377 *A.2d* 1201.]

*See also In re the Trust for the Benefit of Duke, supra,* 305 *N.J.Super.* at 435, 702 *A.2d* 1008 (applying law at time of execution of testator's will and trust, to deny granddaughter, adopted as adult, the rights of "lineal descendant").

As is readily apparent, the present case is easily distinguishable. Nothing in this record suggests Maria adopted plaintiffs for the primary—much less sole—purpose of manipulating trusts interest to divest defendants of their rightful share therein. Maria's testimony at the 1991 adoption proceeding stands unrefuted and defendants offer no competent proof to support their contrary claim. Based on the undisputed evidence, the general equity judge found that Maria had several permissible motives for the

adult adoptions, including "the desire to have a nice close family, her desire to provide for her adopted children to inherit from her, and her desire that her adopted children be treated as natural children for inheritance tax purposes." The fact that prior to the adoption hearing, Maria's attorney wrote to the corporate trustee inquiring as to whether the prospective adoptees would succeed to the income paid under the trust, does not negate the court's findings. Indeed, Maria named plaintiffs in her 1991 will, which was executed before the adoption proceeding, and, less than five months after the adoptions, she executed the codicil stating that she adopted four adults "to create a relationship of parent" pursuant to the adoption judgment. In her 2002 will, Maria again made substantial bequests to plaintiffs.

Equally unavailing is defendants' argument that the court would have denied the adoption petition in 1991, if either Maria or the prospective adoptees had disclosed at that time that the latter would take an interest in the trust at the expense of others. On the contrary, at the adoption hearing, Maria disclosed that she was a beneficiary under a Maryland trust agreement, that she received about $30,000 a year in trust income, and that the provisions in the trust agreement extended to her children. Thus, the court was well aware of the trust and that Maria's interest therein would pass to the adoptees.

And finally on this point, there is no evidence in the record to support defendants' claim that Maria was hostile to her siblings and acted to deprive them of their rightful inheritance. The allegation is based more on impression than proof, and in any event, does not establish a material issue of fact simply because defendants never lost their own share of trust income as a result of the adoption. As the equity judge aptly noted:

> Foster Fenton never gave defendants the interest they now claim was taken from them by Maria. Foster Fenton conferred on each trust beneficiary, including Maria, the right to adopt children, which included both adults and minors, as provided by Maryland law.

Indeed, "[w]hat, if any, effect the adoption had on the interests in the Trust of the other beneficiaries was a matter for

the trustees and the Maryland courts." *Marshall, supra,* 372 *F.*3d at 186. While New Jersey law governs the validity of the adoptions in this case, "the legal incidents and effects of that status [adoption] with respect to property," are "determined by the laws of" the state where the property has its situs. *In re the Estate of Griswold, supra,* 140 *N.J.Super.* at 41, 354 *A.*2d 717. Unquestionably, in this case, by the express terms of the instrument itself, Maryland law governs construction of the trust deed and the rights and interests of those named therein. And under Maryland law, parties are not allowed to scrutinize the motives for an adoption in determining the disposition of trust estates. *Bridges v. Nicely,* 304 *Md.* 1, 497 *A.*2d 142, 147 (1985). Thus, even assuming the improper purpose alleged by defendants, the equity court was not required to annul the adoption for purposes of resolving the rights and interests of the parties to trust assets.

█ On this score, Maryland courts " 'give[ ] full faith and credit' " to " '[t]he status of adoptive relationship[s] created by a valid final decree of adoption in another jurisdiction . . . .' " *Evans v. McCoy,* 291 *Md.* 562, 436 *A.*2d 436, 441 (1981) (quoting *Md. Ann.Code,* § 80 (1957) (repealed 1997)). With regard to adult adoptions, the Maryland Adoption Statute,[2] *Md.Code Ann., Fam. Law* §§ 5–307(a) and 5–309(a) (Maryland statute), provided, " '[a]ny individual . . . [a minor or an adult], may be adopted' by '[a]ny adult.' " *Bridges, supra,* 497 *A.*2d at 147 (quoting *Md.Code Ann., Fam. Law* § 5–307(a), 5–309(a)) (citing *Ex Parte Libertini,* 244 *Md.* 542, 224 *A.*2d 443 (1966)) (first and third alterations in original).

In light of the statute's broad command, Maryland courts consider as irrelevant the fact that an adult adoption was for the purpose of inheritance, and instead presume all adult adoptees are included in class gifts to children. *See ibid.* (holding natural father could adopt biological children, born out of wedlock, to

---

[2] *Md.Code Ann., Fam. Law,* §§ 5–307 to 5–321, has been repealed effective January 1, 2006.

legitimate them). Therefore, under Maryland law, "there is no clear, societal consensus to support a judicially inferred exception" to the statutory presumption that terms including "issue," "child," and "heir" include all adopted persons. *Evans, supra*, 436 *A*.2d at 446, 448–49 (finding adults, adopted in Delaware, were "issue" of their mother with respect to disposition of Maryland trust, regardless of motives, noting it was reasonable to presume an intent to include adopted adults where one adoptee had a "close relationship with the adopting parent [from pre-teen years] and the other ... was a cousin of, and from childhood personally known to, the adopting parent").

Here, of course, we need not ascertain the grantor's probable intent because Foster expressly defined a beneficiary to include an adopted child. Moreover, in Article III, he expressly excluded children adopted by any of his four brothers after the execution of the trust agreement, but did not impose similar limitations on his nieces, nephews or other issue. Thus, the grantor's own actions, as well as applicable Maryland law governing trust construction and the effect of adoptions on trust dispositions, conclusively establish that plaintiffs, as adult adoptees, take under the trust in issue.

In sum, we concur in the equity court's determination that the 1991 adoption was valid as satisfying all the statutory requirements of *N.J.S.A.* 2A:22–1 to –3. Moreover, to the extent relevant, we find no competent proof, raising a material issue of fact, of fraudulent motive or improper purpose to divest defendants of their rightful due. Thus, in accordance with the express terms of the trust agreement and applicable Maryland law, we are satisfied plaintiffs are proper trust beneficiaries.

Affirmed.