**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3612-21
A-3613-21
A-3614-21
A-3616-21

IN THE MATTER OF THE
1979 INTER VIVOS TRUST
OF ALFRED AND MARY
SANZARI, GRANTORS,
DATED JUNE 1, 1979.

_____

IN THE MATTER OF BEN F.
SANZARI TRUST, ALFRED
F. SANZARI, GRANTOR,
DATED OCTOBER 11, 1994.

_____

Argued May 13, 2024 – Decided July 1, 2024

Before Judges Gilson, DeAlmeida, and Berdote Byrne.

On appeal from the Superior Court of New Jersey, Chancery Division, Bergen County, Docket Nos. P-000562-19 and P-000029-20.

Jane A. Grinch argued the cause for appellant/cross-respondent Carl Sanzari (Cullen and Dykman, LLP, attorneys; Jane A. Grinch, of counsel and on the briefs; Steven Siegel, on the briefs).

Cynthia A. Cappell argued the cause for appellant/cross-respondent Ben Sanzari (Law Offices of Cynthia A. Cappell, LLC, attorneys; Cynthia A. Cappell and Christina Cooper, of counsel and on the briefs).

Joseph B. Fiorenzo argued the cause for respondents/cross-appellants David Sanzari and Frank Huttle (Sills Cummis & Gross, PC, attorneys; Joseph B. Fiorenzo, of counsel and on the briefs; Stephen M. Klein, on the briefs).

PER CURIAM

In these four consolidated appeals, defendants Ben[1] and Carl Sanzari appeal from orders that excluded Carl, Ben's adopted son, as a beneficiary of two family trusts. Plaintiffs, David Sanzari and Frank Huttle, in their capacity as trustees of two trusts created by Alfred Sanzari for the benefit of Ben, brought two declaratory judgment actions against Ben and his adopted son Carl to exclude Carl from class gifts intended for Ben's children. The central dispute before us is whether the trust language, which includes the term "adopted children" in the class gifts, encompasses Carl, who was adopted as an adult.

The trial court denied defendants' summary judgment motions and concluded the "stranger to the adoption" doctrine applied a presumption against

---

[1] Because of the common surname, we refer to some the parties by their first names. We intend no disrespect.

an adult adoptee's inclusion in a class gift. Consistent with the doctrine, it placed the burden on defendants to overcome that presumption with evidence of probable intent on the settlors' part to include Carl. Accordingly, at trial, defendants presented their evidence first. At the end of defendants' case, plaintiffs moved for judgment pursuant to Rule 4:37-2(b) and Rule 4:40-1. The trial court granted plaintiffs' motion.

Defendants appeal, arguing the trial court erred in denying them summary judgment and in granting a directed verdict to plaintiffs. Additionally, Ben, who is deaf and legally blind, argues his disabilities were not adequately accommodated at trial, in violation of his due process rights.

Plaintiffs, who sought to demonstrate a "scheme" by Carl's mother, (Ben's second wife) and Carl's biological father to have Carl included in the trust class gifts, cross-appeal from orders granting motions to quash various subpoenas and from related trial rulings excluding evidence of the motive for Carl's adoption as an adult.

Having reviewed the arguments of the parties and the applicable law, we affirm all the trial court's orders because defendants' motion for summary judgment was correctly denied, and the "stranger to the adoption" doctrine

A-3612-21

placed the burden of probable intent upon defendants. Defendants failed to meet their burden and the trial court correctly granted judgment to plaintiffs.

I.

We glean the following facts from the record. Alfred founded a successful real estate business, Alfred Sanzari Enterprises (ASE), in 1945. Alfred and his wife, Mary "wanted nothing more than this business . . . to be carried on by their family." Alfred and Mary had three children: "Freddie," Ben, and David. Alfred and Mary began estate planning as early as 1976, when Alfred first met with attorneys to discuss placing ASE's properties into an inter vivos trust. They executed the first trust (the 1979 Trust) on June 1, 1979. Alfred and Mary continued to revise their estate plan over the years, resulting in the 1992 Last Will and Testament of Mary A. Sanzari, the 1992 Last Will and Testament of Alfred Sanzari, and a second trust (the 1994 Trust), which also held ASE assets. Only Alfred, not Mary, was the grantor of the 1994 Trust.

The 1979 and 1994 Trusts provide a residuary class gift to each child of Ben and to each grandchild of Ben as a secondary beneficiary. In relevant part, the 1994 Trust provides:

2.2 Trust Estate.

The Trust Estate shall be administered as one trust during the life of the Settlor's son, BEN F.

4

SANZARI, (hereinafter "BEN") and continue upon his death until the youngest of his children living on the date of this indenture reaches the age of twenty-five (25) years old, (hereinafter referred as the "Division Date"), and shall be administered as follows:

. . . .

(d) Division Date. Upon the Division Date as defined in Section 2.2, the balance of property remaining in the Trust Estate, subject to the adjustment set forth in Section 2.2(c)(ii), shall be divided into as many equal shares as shall be necessary to create one such share for the Surviving Spouse and for each child of BEN who shall be then living or who is then deceased [(hereinafter "Beneficiary" or "Beneficiaries")], but has left one or more living descendants (hereinafter referred to as "Second Beneficiary" or "Second Beneficiaries").

Section 6.8 of the 1994 Trust, governing the trust's construction, states: "As used herein, wherever this context requires or permits . . . the words 'children' and 'issue' shall include adopted children as though they were Settlor's natural born children and/or issue."

The 1979 Trust provides:

(d) Upon the death of the Beneficiary [(Ben)] and the death or remarriage of BARBARA SANZARI, the present wife of the Beneficiary, the balance of the trust property, including any accumulated income and corpus accretions, shall thereupon be divided into as many equal shares as there are children of the Beneficiary then living . . . and deceased children of the Beneficiary leaving issue then living. . . . Such shares of deceased

5

children leaving issue then living shall be further divided per stirpes. The children and the issue of deceased children entitled to shares hereunder are all hereinafter collectively referred to as "Secondary Beneficiaries" and individually referred to as "Second Beneficiary".

. . . .

(f) All references herein to "issue", "child" or "children" shall be deemed to refer only to issue, child or children born of lawful wedlock or legally adopted.

The trusts did not expressly address whether they included adopted adults. At the time the 1979 Trust was executed, Ben was thirty-two years-old and had three young children with his then-wife Barbara. By 1994, Ben was forty-seven years-old and had a fourth child with Barbara.

The parties agree the trusts were created to keep ASE in the family. Ben conceded at trial that his "father would not provide any interest in his business to someone who was not sufficiently connected with the Sanzari family." Additionally, Alfred's firstborn, Freddie, who had "his own businesses with his wife," was not given any interest in the trusts, and neither was Freddie's wife or daughter. Notes from Alfred and Mary's estate planning admitted at trial indicate Alfred intended that "control of the properties should always be kept away from the wives of Ben and David." And although Ben's three daughters were given interests in ASE, Ben testified Alfred insisted that one of David's

6

sons, or Ben's youngest biological son, Alfred Louis, "be the successor trustee who would be involved in managing the business assets."

The trusts were also intended to ensure that Ben, who is legally blind and was born deaf, would remain financially secure notwithstanding his physical limitations. Huttle and David were appointed trustees to carry out those tasks.

From 2002 until mid-2005, Carl's mother Karina worked as a nurse's assistant for Alfred and Mary. Before Alfred's death on December 11, 2005, Alfred interacted with the minor Carl approximately five times, and knew him only as his nursing assistant's son. Ben did not meet Carl until two years after Alfred's death.

Karina began working as an aide and housekeeper for Ben in 2007. That same year, Ben's first wife Barbara filed for divorce. The divorce was finalized on December 6, 2007. Ben and Karina married six months later, and Carl moved in with the couple. Prior to the wedding, Karina and Ben entered into a prenuptial agreement pursuant to which Karina waived any interest in the trusts or trust-owned property. The agreement states Ben "has four children," Karina "has one child," and provides "[t]he parties mutually intend that each shall be free to provide for his or her child(ren) from Separate Property as each deems

7

A-3612-21

fit, both during the parties' lives and in their estate plans, freely and without consideration of interests or claims of the other spouse."

Ben testified Carl spent time with his step-grandmother, Mary, prior to her death. He testified Carl and Mary "interact[ed] a lot," he visited Mary with Carl every Sunday and "[s]ometimes Saturdays," and they would go out to eat together. Ben described Mary as "affectionate" toward Carl, "always greet[ing] him good morning and hug[ging] him," and said Mary had told Carl she loved him.

Ben testified Mary treated Carl as she did her other grandchildren, including making a monetary Christmas gift to Carl in 2009 from the 1979 Trust. However, on cross-examination, Ben admitted the $20,000 gift to Carl was made at his own suggestion and decision, and David — not Mary — as trustee of the trust, accepted his suggestion and signed the check. Carl testified he did not know whether Mary "had any role whatsoever with respect to the" check. Ben testified 2009 was the first time Carl received one of the Christmas checks.

Mary, who had suffered several serious health problems for years — including vision problems necessitating multiple eye surgeries and a liver transplant — became "very sick" by the end of 2009 with heart and lung problems. Mary died on February 23, 2010.

Ben alleged for the first time at trial that shortly before Mary's death, in December of 2009, he told Mary he wanted Carl to become a "part of the trust," and she agreed. He claimed the only person he ever spoke to around that time about adopting Carl or including him in the trust was Mary.

Ben testified Alfred and Mary created trusts for each of Ben's children, and either Alfred and Mary together, or Mary alone after Alfred passed, created trusts for the benefit of each of Ben's grandchildren within a couple months of their births. However, in the twenty-one-month span between Ben's marriage to Karina and Mary's death, Mary did not create a trust for Carl. Nor did she amend her will to bequeath anything to Carl.

On October 13, 2017, Ben, at age seventy, adopted Carl, then eighteen years-old. Plaintiffs filed two verified complaints, one for each of the trusts, seeking declaratory relief.

## II.

Initially we note defendants claim to appeal from the orders denying them summary judgment prior to trial. However, all of the notices of appeal and case information statements filed by defendants under all relevant docket numbers identify only the May 5, 2022 orders of judgment as the orders being

appealed. Although the orders denying summary judgment are not identified, we address them for the sake of completeness.

<u>The Trial Court's Order Denying Summary Judgment to Defendants</u>.

In reviewing summary judgment orders, we employ a de novo standard of review and apply the same standard employed by the trial court. <u>Samolyk v. Berthe</u>, 251 N.J. 73, 78 (2022). Accordingly, we determine whether the moving party has demonstrated there are no genuine disputes as to any material fact and, if so, whether the facts, viewed in the light most favorable to the non-moving party, entitle the moving party to a judgment as a matter of law. <u>R.</u> 4:46-2(c); <u>see also</u> <u>Davis v. Brickman Landscaping, Ltd.</u>, 219 N.J. 395, 405-06 (2014); <u>Brill v. Guardian Life Ins. Co. of Am.</u>, 142 N.J. 520, 540 (1995).

"A dispute of material fact is 'genuine only if, considering the burden of persuasion at trial, the evidence submitted by the parties on the motion, together with all legitimate inferences therefrom favoring the non-moving party, would require submission of the issue to the trier of fact.'" <u>Gayles by Gayles v. Sky Zone Trampoline Park</u>, 468 N.J. Super. 17, 22 (App. Div. 2021) (quoting <u>Grande v. Saint Clare's Health Sys.</u>, 230 N.J. 1, 24 (2017)).

In its written opinion, the trial court rejected defendants' argument that the trusts were clear on their faces, Carl automatically qualified as a beneficiary

because of the "adopted child" language, and there was no need for the court to consider the doctrine of probable intent. The court found genuine issues of material fact existed as to the probable intent of Alfred and Mary, noting in particular that Huttle, who drafted the 1994 Trust, testified at deposition, based on his discussions with both settlors, they "did not want anyone who is not a blood relative of the Sanzari family to control any of the real estate then owned or thereafter acquired by the [t]rusts." The court also rejected defendants' argument that plaintiffs were seeking to have the trusts reformed, rather than interpreted, to exclude Carl. We agree.

The plain language of both trusts refers only to adopted "children." In the legal context, "child" refers to "[a]n unemancipated person under the age of majority." Black's Law Dictionary 299 (11th ed. 2019).[2] More colloquially, "child" refers to a "recently born person." Mirriam-Webster's Collegiate Dictionary 214 (11th ed. 2020). The plain language of both trusts provides that a child adopted by Ben would constitute a "child" or "issue" within the meaning

_____

[2] New Jersey statutes generally compare children to individuals who have reached the age of majority, noting the disaffirming effect minority has on the ability to transact, contract, or participate in certain enumerated activities. See, e.g., N.J.S.A. 9:17B-1 to -4 (the age of majority statute, which governs legal capacity to contract, sue and be sued, serve on juries, marry, and adopt children; and disallowing children from participating in those activities).

of the trusts. Ben testified there was only one adoption known in the family prior to his adoption of Carl as an adult, which occurred when Alfred's brother Gene and his wife adopted an infant after they were unable to conceive. Ben testified he had no insights into the purposes of either trusts. He testified he did not "know the reason behind [his] parents establishing a trust for [him]" and "they never talked to [him] about it." Defendants offered no evidence regarding Alfred's or Mary's purpose in including the term "adopted children" in the trusts. We conclude the trial court did not err in denying summary judgment to defendants.

The Stranger to the Adoption Doctrine.

Defendants further argue the court erred in applying the "stranger to the adoption" doctrine to place the burden of proving probable intent on them.

When interpreting a trust our aim is to ascertain the probable intent of the testator or settlor. In re Est. of Payne, 186 N.J. 324, 335 (2006). In doing so, courts "employ presumptions," In re Tr. Under Agreement of Vander Poel, 396 N.J. Super. 218, 226 (App. Div. 2007), established by "impulses . . . common to human nature," Fidelity Union Tr. Co. v. Robert, 36 N.J. 561, 565 (1962).

"The 'stranger to the adoption' doctrine is a well-established, judicially-created doctrine." In re Tr. for the Benefit of Duke, 305 N.J. Super. 408, 427

12

(Ch. Div. 1995). Historically, New Jersey courts acknowledged "a presumption that an adopted child could not take property under an instrument created by someone other than the adoptive parent unless the instrument itself indicated a specific intent that the adopted child should take." Id. at 427-28. "In 1953, the Legislature eliminated the 'stranger to the adoption' doctrine as it related to minors," but not "as it relates to the adult adoption statute." Id. at 429.

The adult adoption statute, provides, in relevant part:

> c. All rights, privileges and obligations due from the parents by adoption to the person adopted and from the person adopted to them and all relations between such person and them shall be the same as if the person adopted had been born to them in lawful wedlock, including the right to take and inherit intestate personal and real property from and through each other.
>
> Except, however, that:
>
> a. The person adopted shall not be capable of taking property expressly limited by a will or any other instrument to the heirs of the body of the adopting parent or parents, nor property coming on intestacy from the collateral kindred of the adopting parent or parents by right of representation; . . . .
>
> [N.J.S.A. 2A:22-3.]

Although the latter provision provides that an adopted adult cannot take if the trust is limited to "heirs of the body," otherwise referred to as "[t]he 'stranger to the adoption' provision," Duke, 305 N.J. Super. at 427, the judicial doctrine is

13

broader than the statute and includes situations in which an instrument executed by a stranger to the adoption does not make specific provision for a specific adoptee.

In In re Estate of Griswold, the court observed the distinction between an adopted child and an adopted adult: "[t]here was at the time no reason for testator or his counsel to think about the possibility of either of his sons" – both of whom were beneficiaries – "adopting an adult." 140 N.J. Super. 35, 47 (Cnty. Ct. 1976). Although it could be presumed the testator would not have drawn a distinction between a natural child and an adopted child, the court thought it "clear" the testator would have strongly disapproved of diverting the assets of the trust by allowing an adopted adult to have a share "even though a stepson-in-law." Id. at 47-48. The Griswold court explained the rationale for distinguishing between adult and child adoptees:

> The adoption of children and the adoption of adults involve quite different considerations and different factors of policy and require and receive different treatment. The basic purpose of child adoption is to provide and protect the welfare of children, to provide homes and families and security for homeless children, and to provide children for couples who desire to have children to love and raise and maintain. A substantial factor here is the duty and obligation of support and maintenance.

In an adult adoption the relation between the parties is different, the motivation can be quite varied, and such adoptions are treated differently in the statutes. Adoption of adults is ordinarily quite simple and almost in the nature of a civil contract. . . . The complete severing of the relation to natural parents is not accomplished in an adult adoption; the relation remains in New Jersey as to inheritance in case of intestacy of the natural parents.

[Id. at 51-52.]

In In re Estate of Nicol, 152 N.J. Super. 308, 319 (App. Div. 1977), we "thoroughly agree[d]" with that reasoning, stating:

It is one thing to ascribe to a testator a contemplation of the possibility of that which has come to be relatively commonplace, namely, the adoption of a child at some time in the future by a member of the family or other relative, or any other prospective beneficiary under a will. Frequently, in such cases, the child is acquired in infancy, although the child may be older where a spouse adopts a stepchild. In both instances, however, the child is reared as one's own by the adopting parent and is recognized as such among the family and friends.

But it is quite another matter where the adopted person is an adult. . . . One would be hard-pressed to ascribe to a testator, in the absence of any expression thereon or of clarifying attendant circumstances, a probable intent to include an adopted adult among the children or issue of a testamentary beneficiary. It is extremely unlikely that a testator would foresee the likelihood that his or her child, or any other prospective beneficiary, might at some time in the future adopt an adult. It is equally improbable that an adopted adult

15

> would be embraced in the bosom of the family members other than the adopting parent, as would an adopted child.

Notably, although Nicol suggests an "older" adopted stepchild would normally be seen as the adoptive parent's "own" child, id. at 319, the "stranger to the adoption" doctrine applied nonetheless where the stepchild was a minor when the stepparent-stepchild relationship began, but an adult when adopted. Id. at 311, 320.

In Vander Poel, we considered the circumstance of a stepchild, Jane, later adopted as an adult, and her entitlement to proceeds from a trust created for her adoptive father by his mother. 396 N.J. Super. at 222-26. The trust in question provided that after the father's death, trust income was to be distributed to the settlor's living issue, which the trust defined "only as 'lawful issue.'" Id. at 222. When the trust was created, Jane's father was single and childless. Ibid. Soon after, he married Jane's mother, who had Jane from a prior marriage, and the couple later had biological children. Ibid. Her father discussed adopting Jane, and consulted with an attorney, but struggled to identify the best jurisdiction in which to effectuate the adoption, because the family had emigrated. Id. at 223-24. The adoption did not occur until several years after Jane turned eighteen. Id. at 224.

A-3612-21

As in <u>Nicol</u>, we determined Jane was "subject to the 'stranger to the adoption' presumption." <u>Id.</u> at 232. In analyzing the settlor's probable intent, we observed the settlor "never established a separate trust for Jane as she did with each of the other children" and subsequent to Jane's adoption "specifically excluded adoptees from sharing in [a second] trust and her will." <u>Id.</u> at 234. Thus, not only did Jane not overcome the "stranger to the adoption" presumption, but the facts affirmatively "point[ed] to the probable intention by [the settlor] to keep [her family] fortune within bloodlines." <u>Ibid.</u>

Ben and Carl both argue the "stranger to the adoption" doctrine does not apply pursuant to N.J.S.A. 2A:22-3(c)(a) because 1) the trusts did not limit class beneficiary status to Ben's "heirs of the body"; and 2) because they specifically included adoptees. We are unpersuaded. Whether a trust specifically uses the term "heirs of the body" is not the controlling language. As previously noted, the "stranger to the adoption" doctrine is judicially created and is broader than the statute. The presumption is not limited to cases where the trust explicitly uses the term "heirs of the body." For example, in <u>Vander Poel</u>, the term used was "issue" and we concluded the presumption still applied. 396 N.J. Super. at 232.

17

Defendant's second contention arguably creates a question of first impression: whether the "stranger to the adoption" doctrine applies to adult adoptees in cases where "child," "issue," and the like expressly includes child adoptees, but neither the trust itself nor the surrounding circumstances suggest the settlor contemplated adult adoption.

In arguing "the [t]rusts expressly authorized beneficiary status to Ben's adoptees" and that this "should end the judicial inquiry," defendants rely on In re Estate of Fenton, 386 N.J. Super. 404, 416 (App. Div. 2006). Their reliance is misplaced. Fenton concerned the validity of an adult adoption, not the probable intent of a testator. Id. at 412-13, 421-22. The plaintiffs, adult adoptees seeking to take pursuant to a trust, filed suit against defendant trust beneficiaries for a declaration that the judgment pursuant to which they were adopted remained in effect "and was valid for all purposes." Id. at 411. The trust indirectly at issue in Fenton expressly defined "child, children and issue" to include "an adopted child." Id. at 408. The trial court held the adult adoptions were valid, recognizing that was "the only real issue before the trial court," but also concluded the trust "conferred on each trust beneficiary, including [the plaintiffs' adoptive parent], the right to adopt children, which included both adults and minors, as provided by Maryland law." Id. at 412-13.

On appeal, we affirmed. Id. at 422. With respect to the trust, we reiterated it was governed by Maryland law, which, unlike New Jersey, "presume[s] all adult adoptees are included in class gifts to children." Id. at 421.

Fenton is inapplicable because we had no occasion to decide or apply New Jersey law regarding the rights of adult adoptees. As we have made clear, when applying New Jersey law adult and child adoption are two different processes, with different purposes, requirements, and consequences. Nicol, 152 N.J. Super. at 319; Griswold, 140 N.J. Super. at 51-52. New Jersey's statutes, unlikely Maryland's, expressly presume a lack of intent to include adult adoptees because of the legal and social differences between adult and child adoptions.

In sum, the trust language regarding adopted children cannot on its face be read as an expression of intent to include adult adoptees. Nothing else in the language of either trust or the surrounding circumstances suggests adult adoptees were meant to be included in the class.

Defendants' Proffered Evidence of Probable Intent.

Motions for judgment at the close of a plaintiff's case, R. 4:37-2(b), and motions for judgment at the close either "of all the evidence or at the close of the evidence offered by an opponent," R. 4:40-1, are governed by the same standard: "[I]f, accepting as true all the evidence which supports the position of

19

the party defending against the motion and according him the benefit of all inferences which can reasonably and legitimately be deduced therefrom, reasonable minds could differ, the motion must be denied." Verdicchio v. Ricca, 179 N.J. 1, 30 (2004) (alteration in original) (quoting Est. of Roach v. TRW, Inc., 164 N.J. 598, 612 (2000)). "The trial court is not concerned with the worth, nature or extent (beyond a scintilla) of the evidence, but only with its existence, viewed most favorably to the party opposing the motion." Perez v. Professionally Green, LLC, 215 N.J. 388, 407 (2013) (quoting Dolson v. Anastasia, 55 N.J. 2, 5-6 (1969)).

Again, the aim of a court interpreting a trust is to ascertain the probable intent of the settlor or testator. Payne, 186 N.J. at 335. By statute,

> [t]he intention of a settlor as expressed in a trust, or of an individual as expressed in a governing instrument, controls the legal effect of the dispositions therein and the rules of construction expressed in N.J.S. 3B:34 through N.J.S. 3B:3-48 shall apply unless the probable intent of such settlor or of such individual, as indicated by the trust or by such governing instrument and relevant circumstances, is contrary.
>
> [N.J.S.A. 3B:3-33.1(b).]

When interpreting a trust or similar instrument, courts must give "primary emphasis to [the settlor's] dominant plan and purpose as they appear from the entirety of [the trust] when read and considered in light of the surrounding facts

20

and circumstances." Payne, 186 N.J. at 335 (quoting Fidelity Union Tr. Co., 36 N.J. at 564-65).

"The settlor's probable intent deserves vindication to bar unintended takers, as well as to protect intended beneficiaries." In re Tr. of Nelson, 454 N.J. Super. 151, 164 (App. Div. 2018). We reject a plain meaning approach to trust interpretation and may engage in the probable intent inquiry even where a document is clear on its face, and will consider extrinsic evidence to aid in determining probable intent. Id. at 163; Payne, 186 N.J. at 335. Extrinsic evidence the court may consider is "not limited to what was known to the testator at the time of the execution of the" instrument. In re Est. of Baker, 297 N.J. Super. 203, 210 (App. Div. 1997). Our Supreme Court instructs us to "strain toward effectuating the testator's probable intent to accomplish what he would have done had he envisioned the present inquiry." Payne, 186 N.J. at 335 (quoting In re Est. of Branigan, 129 N.J. 324, 332 (1992)) (internal quotation marks omitted).

Here, in its written decision granting plaintiffs' motion for judgment, the court had shifted the burden of proof to defendants to demonstrate Carl, an adult adoptee, was an intended secondary beneficiary to the trusts. The court concluded defendants did not meet that burden, noting Ben and Carl were not

able to provide any testimony as to the meaning of the term "adopted children" as set forth in the trusts. Alfred knew Carl only as his nurse's assistant's son, when Karina was employed to care for him and Mary; defendants' assertion that Mary treated Carl as a grandson was based largely on a single monetary Christmas gift from Mary to Carl in 2009, which Ben acknowledged was actually made by David at Ben's request; Mary's will made specific bequests to all of her grandchildren but not to Carl, even though he was known to her; and Mary created trusts for each of her biological grandchildren but not for Carl.

The court also found defendants' testimony about the loving and genuine relationship between Ben and Carl not relevant, ruling that "such love and affection is not attributable to Alfred and Mary and does not support defendants' contentions regarding the probable intention of Alfred and Mary." Finally, the court rejected Ben's testimony that he told Mary in 2009 he intended to adopt Carl and wanted him to be included as a secondary beneficiary, finding it inconsistent with Ben's testimony that he never reviewed the trusts prior to Mary's death, and as legally insufficient, "self-serving" testimony pursuant to the Dead Man's Act, N.J.S.A. 2A:81-2. Thus, the court concluded defendants "failed to present evidence as to the probable intent of Alfred and/or Mary

22

sufficient to overcome the presumption of the 'stranger to the adoption' doctrine."

Ben argues on appeal the trial court failed to give reasonable inferences to defendants, and thus, did not appropriately apply the standard applicable on a motion for judgment. Ben contends the trial court improperly disregarded similar language regarding child adoptees in other testamentary instruments executed by Alfred and Mary, as well as notes and draft documents recorded by their attorneys. None of Ben's examples specifically include adult adoptees or mention adult adoption. Moreover, the trusts make no mention of adult adoptees. Although Ben posits this evidence as conspicuously missing any proof of a "secret intention to limit or restrict beneficiary status to only certain types of adoptees," we view it as the absence of an expression of intent to specifically include adult adoptees in a class gift.

Ben also argues the trial court ignored evidence of "Carl's personal interactions with Alfred and Mary and, in particular, Mary's treatment of Carl as a member of the Sanzari Family." Ben contends this evidence permitted an inference that "Alfred and Mary not only intended <u>any</u> legal adoptee of Ben be treated as a class beneficiary under the [t]rusts . . . but also that Alfred and Mary

intended that Carl, in particular, be treated as a class beneficiary under the [t]rusts."

Defendants are entitled to the benefit of only "reasonabl[e]" inferences. <u>Roach</u>, 164 N.J. at 612. It is not reasonable to infer from their interactions any intent by Alfred to specifically include Carl as a class beneficiary when Alfred knew Carl only as his employee's son. It likewise is not reasonable to infer Mary treated Carl like Ben's other children, when the undisputed evidence demonstrates Mary did not create a trust for Carl or bequeath anything to Carl in her will, as she did for Ben's other children. And not all Sanzari family members were included in the two trusts: Freddy, his wife, and children were specifically excluded. Even if Mary "treat[ed] Carl as a member of the Sanzari family," that fact is insufficient to support an inference that she intended Carl to become a secondary beneficiary.

Finally, Ben argues the court discounted undisputed evidence of a "loving relationship" between Ben and Carl in finding that "such love and affection is not attributable to Alfred and Mary and does not support [d]efendants' contentions regarding the probable intention of Alfred and Mary." Ben contends "the existence of a loving parent-child relationship is highly relevant to the 'stranger to the adoption' inquiry" because the doctrine considers whether the

adoptive parent's "sole purpose" in adopting is to secure financial benefits for the adoptee, citing In re the Est. of Comly, 90 N.J. Super. 498, 503 (Cnty. Ct. 1966), and Fenton, 386 N.J. Super. at 418, itself discussing Comly.

The Comly court held that "[w]hile undeniably it is the policy of the Legislature to place adopted children on a level with natural children, such a policy should not be used to permit the adoption of adults for the sole purpose of giving them an interest in property." 90 N.J. Super. at 503. The court also said more generally that:

> If any adult that [the adoptive parent] chose to adopt qualified as a "child" under the will [at issue], then, in effect, [the adoptive parent] would have a power of appointment over the property and could lessen the shares of his natural children as much as he pleased without any obligation on his part to provide and care for the adopted "child."
>
> [Id. at 503.]

This, the court said, was "obviously" not the intent of our Supreme Court in deciding In re Est. of Coe, 42 N.J. 485 (1964), when it held adopted children qualified as "children" within the meaning of an instrument. Comly, 90 N.J. Super. at 503. Comly and Fenton do not support Ben's argument. A genuine, loving basis for an adult adoption alone is insufficient to overcome the

presumption against adult adoptees. Nothing in our decision today precludes Carl from inheriting from Ben.

The Trial Court's Accommodations.

Finally, Ben argues the trial court failed to provide reasonable accommodations to him during trial for his known disabilities, which he alleged affected his ability to understand the proceedings. Ben's contention is not supported by the record, and he does not state what specific accommodations the trial court failed to afford him. The record demonstrates the court limited trial testimony to approximately two and a half hours each day at Ben's request, so as not to exhaust him, and provided four ASL interpreters at all times. It also granted trial adjournments twice to accommodate Ben so he could vacation and ensured he had visibility of his interpreters. We discern no merit in Ben's argument regarding a lack of accommodation by the trial court.

Plaintiffs' appeals are rendered moot by our affirmance. To the extent we have not addressed a parties' argument, we are satisfied they lack sufficient merit to warrant discussion in our opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office

CLERK OF THE APPELLATE DIVISION

A-3612-21